No. 91,251

STATE OF KANSAS, *Appellee*, v. CHRISTOPHER M. TROTTER, *Appellant.*

(127 P.3d 972)

Opinion filed February 3, 2006.

*Reid T. Nelson*, capital appellate defender, argued the cause and was on the briefs for appellant.

*Michael A. Russell*, chief deputy district attorney, argued the cause, and *Jerome A. Gorman*, district attorney, and *Phill Kline*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

LOCKETT, J.: Christopher M. Trotter appeals his convictions for first-degree premeditated murder, capital murder, aggravated robbery, and conspiracy to commit aggravated robbery. Trotter argues that (1) the trial court should have given an instruction regarding eyewitness identification; (2) the trial court erroneously admitted evidence that a victim was pregnant; (3) he was denied a fair trial because the State used nine peremptory strikes to eliminate 9 of the 10 African-Americans from the jury; and (4) the evidence was not sufficient to support his convictions.

## FACTS

Just before daybreak on May 21, 2001, Christopher Trotter (Trotter), Virdal Nash, Kevin Eddington, and Michael Navarre were crouched in the woods behind the duplex of James Darnell Wallace and his wife Traylennea Huff in Kansas City, Kansas. Dressed in dark colors to avoid detection, the four were waiting for an opportunity to enter the duplex and rob the occupants of an expected $100,000. A fifth accomplice, James Trotter (James), was parked nearby in a gold Saturn owned by Trotter's girlfriend. James

was to be positioned down the road as a lookout, watching for police. James was in contact with Trotter via two-way radios.

Led by Trotter, the five had spent the previous day devising a plan for the robbery. According to the plan, Nash and Navarre were to enter into the half of the duplex that they believed to be occupied by Wallace's mother and prevent her from calling the police. Trotter and Eddington were to enter Wallace and Huff's side of the duplex, yell, "ATF," bind the victims with zip-ties, take the money, and leave.

Because Trotter and Nash knew Wallace and Huff, the four intruders planned to wear something that covered their faces. Trotter, Nash, and Eddington had t-shirts to tie around their heads. Navarre had a *Scream* mask to cover his face. Each wore gloves to avoid leaving fingerprints. As a show of force, Trotter was armed with Nash's .38 caliber, semi-automatic pistol, and Navarre had Trotter's nonfunctioning assault rifle.

When the four first arrived at the duplex, Trotter and Eddington checked the doors to see if they could break in. After they discovered that they could not break in through the doors, Trotter pulled out the phone line, and then the two returned to the woods to wait with Nash and Navarre. Before there was an opportunity for the four to enter the duplexes, Nash received a call from his wife asking him to bring her car home so she could go to work. While the others remained outside the duplex waiting for their opportunity to get in, Nash left to take the car to his wife.

Just as it was becoming daylight, but before Nash had returned, Wallace opened the garage door to take his dog out. Trotter ran toward the house followed by Eddington and Navarre. Trotter ordered Wallace to freeze. When Wallace began wrestling with Trotter over the gun, Eddington and Navarre ran past them into the garage and up the stairs into the house. At one point, Eddington looked back, observed Wallace remove the t-shirt from Trotter's face, and heard Wallace say to Trotter, "[C]ome on, Chris, you ain't got to do it."

Eddington and Navarre encountered Huff on the stairs. Huff screamed, "I'm pregnant, don't hurt me." Eddington bound Huff's hands with a zip-tie, then Navarre asked her where the money was

hidden. Huff stated that the money was in her bedroom under the bed. Eddington and Navarre then proceeded into the bedroom. Navarre looked under the bed for the money. Huff returned to the bed and laid down next to her 2-year-old daughter Janae, who had been sleeping in the bed with her mother.

While Navarre was searching for the money, he heard a gunshot. Navarre quickly located the money under the bed and gave it to Eddington. When a second gunshot sounded, Eddington and Navarre ran from the room, down the stairs, out of the garage, and headed back through the woods to where Nash had previously parked the car. As he was going down the stairs, Navarre passed Trotter, who was headed up the stairs. After Navarre was in the woods, he heard another gunshot. Then Trotter came running up behind Navarre.

After returning the car to his wife, Nash had changed into his work uniform and driven his ADT company van back to the area where he had been parked for the robbery. Shortly after Nash arrived, he observed Eddington, Trotter, and Navarre running towards him. After the three jumped into Nash's ADT van, Nash drove away.

Once inside the van, Trotter mumbled, "Look what you made me do. He should have just laid down. All he had to do was just lay down. I wouldn't have had to kill him. He wouldn't have to get killed."

James followed them in the gold Saturn. When they arrived at Nash's house, Eddington counted $4,000 as the spoils from the robbery. The five divided it equally, each taking $800. Nash then disposed of the clothes and the weapons.

Damante Huff, Wallace and Huff's 8-year-old son, informed the police that he awoke to noises in the house. He heard his mom say, "I'm pregnant. I swear to God it's in there." Damante got up from his bed and looked out of his bedroom door. A man in the hallway with his mother pushed him back into his room. Damante returned to his bed, but he could see another man who appeared to be fighting with his father on the stairs. Damante heard his father say, "Chris." Then, Damante heard gunshots.

Damante stayed in his bed until everything was quiet. Damante, followed by his 7-year-old sister, Ebony, went to his parents' room. Damante asked his mother where his father was. Huff did not respond. Huff had been killed by a point-blank gunshot in the back of her head. Janae was awake and shaking next to her mother's body. Damante picked Janae up and ran out of the house with his two sisters. As Damante ran out of the garage, Damante observed his father slumped over the neighbor's car. Wallace was dead. He had been beaten, then shot twice, once in the face and once in the back of the head. Damante and his sisters ran to a nearby friend's house. His friend's mother called the police.

During the investigation, Damante told police that his father's friend Chris did it. Police then asked Wallace's mother, Marva Wallace, who her son knew named Chris. Marva informed the officers that her son knew a Chris Trotter. Wallace had gone to high school with a Trotter in Leavenworth. Officers soon connected Trotter with Nash, Eddington, Navarre, and James.

Nash, Eddington, and Navarre entered into plea agreements, with each of them agreeing to plead guilty to one count of aggravated robbery and one count of conspiracy to commit aggravated robbery. In addition, they each agreed that the sentences for those crimes would be run consecutively. Pursuant to the agreements, Nash was sentenced to a total of 95 months in prison, Eddington was sentenced to 111 months in prison, and Navarre was sentenced to 95 months in prison. As part of the plea agreements, Nash, Eddington, and Navarre agreed to testify against any and all co-defendants. In exchange for their pleas, the State agreed to drop the murder charges, preventing Nash, Eddington, and Navarre from facing the possibility of life in prison or the death penalty.

Trotter was charged with first-degree premeditated murder for killing Wallace, capital murder for killing Huff, aggravated robbery, and conspiracy to commit aggravated robbery. The State sought the death penalty for the capital-murder charge. At trial, Nash, Eddington, and Navarre testified against Trotter and identified him as the shooter. The only physical evidence linking Trotter to the crimes was his fingerprints on the batteries in a flashlight found in

the grass behind Wallace and Huff's duplex. A jury convicted Trotter of all charges but refused to impose the death penalty.

The district judge sentenced Trotter to concurrent hard-50 life sentences for both of the murder convictions and ordered that Trotter serve 79 months for the aggravated robbery conviction and 32 months for the conspiracy conviction. Each of those sentences was to run concurrent with his hard-50 life sentence.

Trotter appeals his convictions to this court pursuant to K.S.A. 22-3601(b)(1), raising four issues. Trotter claims (1) the trial court should have given an instruction regarding eyewitness identification; (2) the trial court erroneously admitted evidence that Huff was pregnant; (3) he was denied a fair trial because the State eliminated 9 of the 10 African-Americans on the jury; and (4) the evidence was not sufficient to support his convictions.

## I. Failure to give an instruction regarding eyewitness identifications

Trotter claims that the trial court should have given the jury the following eyewitness identification instruction:

"The law places the burden upon the State to identify the defendant. The law does not require the defendant to prove (he)(she) has been wrongly identified. In weighing the reliability of eyewitness identification testimony, you first should determine whether any of the following factors existed and, if so, the extent to which they would affect the accuracy of identification by an eyewitness. Factors you may consider are:

"1. The opportunity the witness had to observe. This includes any physical condition which could affect the ability of the witness to observe, the length of the time of observation, and any limitations on observation like an obstruction or poor lighting;

"2. The emotional state of the witness at the time, including that which might be caused by the use of a weapon or a threat of violence;

"3. Whether the witness had observed the defendant(s) on earlier occasions;

"4. Whether a significant amount of time elapsed between the crime charged and any later identification;

"5. Whether the witness ever failed to identify the defendant(s) or made any inconsistent identification;

"6. The degree of certainty demonstrated by the witness at the time of any identification of the accused; and

"7. Whether there are any other circumstances that may have affected the accuracy of the eyewitness identification." PIK Crim. 3d 52.20.

Trotter claims that he requested an eyewitness identification instruction, and therefore this court is required to view the evidence in a light most favorable to him. See *State v. Williams*, 277 Kan. 338, 356, 85 P.3d 697 (2004) (requiring the court to evaluate a requested instruction in a light most favorable to the defendant). First, we note that Trotter did not request the PIK instruction he now claims was necessary. Rather, Trotter requested the following instruction:

"Credibility of Witnesses

"In deciding the facts of this case, you may have to decide which testimony to believe and which testimony not to believe. You may believe everything a witness says, or part of it, or none of it.

"In considering the testimony of any witness, you may take into account:

"1.  the opportunity and ability of the witness to see or hear or know the things testified to;

"2.  the witness' memory;

"3  the witness' manner while testifying;

"4.  the witness' interest in the outcome of the case and any bias or prejudice;

"5.  whether other evidence contradicted the witness' testimony;

"6.  the reasonableness of the witness' testimony in light of all evidence; and

"7.  any other factors that bear on believability.

"The weight of the evidence as to a fact does not necessarily depend on the number of witnesses who testify."

We have previously noted that the reliability of an eyewitness identification is not the same as the credibility of a witness. *State v. Calvin*, 279 Kan. 193, 206, 105 P.3d 710 (2005); *State v. Mann*, 274 Kan. 670, 678-79, 56 P.3d 212 (2002). Trotter's requested instruction addresses witness credibility rather than eyewitness reliability. Thus, the instruction Trotter requested is not equivalent to the instruction he now claims as error on appeal.

"No party may assign as error the giving or failure to give an instruction unless he or she objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he or she objects and the grounds of his or her objection, unless the instruction or the failure to give the instruction is clearly erroneous. K.S.A. 2000 Supp. 22-3414(3). Instructions are clearly erroneous only if the reviewing court is firmly convinced that there is a real possibility the jury would have rendered a different verdict if the trial error had not occurred. [Citation omitted.]" *State v. Saenz*, 271 Kan. 339, 346, 22 P.3d 151 (2001).

The instruction Trotter requested applies to witness credibility in general and does not contain the factors for considering the reliability of eyewitness identifications. Thus, the instruction Trotter requested is not an eyewitness identification instruction and the proper standard of review is clearly erroneous. Trotter now relies on *State v. Hunt*, 275 Kan. 811, 69 P.3d 571 (2003), for the proposition that the court *must* give an eyewitness identification instruction if identification is a central issue in the case.

In *Hunt*, the court considered the propriety of a one-person show-up eyewitness identification procedure. The *Hunt* court refined the process for evaluating the reliability of eyewitness identifications, stating that "where such identification is a central issue in a case, a cautionary instruction regarding eyewitness identification *should* be given." (Emphasis added.) 275 Kan. at 818. However, the *Hunt* court did not consider when the failure to give such an eyewitness instruction constituted reversible error. Therefore, *Hunt* does not stand for the proposition that a court must give an eyewitness identification instruction any time a witness makes an in-court identification, regardless of whether the defendant requests the instruction or not. Trotter's reliance on *Hunt* to circumvent the clearly erroneous standard of review is misplaced.

Trotter also relies on *State v. Warren*, 230 Kan. 385, 635 P.2d 1236 (1981), to support his assertion that an eyewitness identification instruction must be given whether the defendant requests one or not. In *Warren*, the defendant was charged with attempted aggravated robbery. An alleged accomplice testified against Warren, and one of the victims identified Warren at trial. Warren then attempted to admit expert testimony regarding the lack of reliability for eyewitness identifications, and his request for an eyewitness identification instruction was denied by the trial judge. The *Warren* court reversed the defendant's conviction based on other grounds unrelated to the victim's in-court identification. 230 Kan. at 389.

Nevertheless, the *Warren* court addressed the admission of expert testimony on eyewitness identifications and the defendant's request for an eyewitness identification instruction. The *Warren* court concluded that an eyewitness identification "instruction

*should* be given in any appropriate case." (Emphasis added.) 230 Kan. at 400. However, we note that *Warren* does not require the trial court to give an eyewitness identification instruction if the defendant has not requested that instruction. The defendant in *Warren* had specifically requested the instruction. Trotter did not request an instruction on eyewitness reliability. Under these circumstances, Trotter's reliance on *Warren* to circumvent the clearly erroneous standard of review is without merit.

To further support his argument, Trotter then analogizes the facts in *Warren* to the facts in his case. In *Warren*, the eyewitness' initial description did not completely match the defendant's characteristics, and the description was not consistent from hearing to hearing. In addition, the eyewitness did not identify the defendant until 4½ months after the robbery when he was told that the police had arrested the man that robbed him and that the man was in the courtroom. The only man in the courtroom was the defendant.

True to Trotter's analogy, the facts in this case are similar to those in *Warren*. In this case, the day after his parents were murdered, Damante could not identify a picture of Trotter as the man who pushed him or killed his parents. Rather, Damante misidentified the picture of Trotter as his father's friend Rock, who was married to Trotter's sister, Lajoh. Damante identified Trotter's picture 3 months later when police showed him pictures of all five of the codefendants. Trotter asserts that, at that point, it was possible that Damante had observed Trotter's picture on television as the suspect in the case.

Although Trotter's argument focuses on the factual similarities between this case and *Warren*, comparing the delay in making the identifications and the inconsistency of the identifications, Trotter's argument overlooks a key difference between this case and *Warren*. In *Warren*, the eyewitness was identifying a complete stranger. Here, Damante knew Trotter, because Trotter was a friend of Wallace's. Trotter had been to Damante's house previously to visit Wallace. Damante also knew that Trotter sometimes visited with Trotter's sister Lajoh and her husband Rock. Thus, Trotter was not a stranger to Damante.

We have previously held that an eyewitness identification instruction is not necessary when the witness is familiar with the person being identified. See, *e.g.*, *State v. Calvin*, 279 Kan. at 206-07 (concluding that the witness was sufficiently familiar with the defendant who had been to the witness' house on at least 20 occasions to purchase drugs from the witness' brother); *State v. Mann*, 274 Kan. at 678-79 (concluding the trial court's failure to give the instruction was not clearly erroneous because the witness knew the defendant); *State v. Saenz*, 271 Kan. at 353-54 (finding no error in failing to give the instruction because the witness knew the defendant). " 'Where the witness personally knows the individual being identified, the cautionary eyewitness identification instruction is not necessary and the accuracy of the identification can be sufficiently challenged through cross-examination.' " 279 Kan. at 206 (quoting *Mann*, 274 Kan. 670 Syl. ¶ 2).

Trotter's defense counsel thoroughly challenged Damante's identification at trial. In fact, the State did not request Damante to identify Trotter during its direct examination. Rather, on direct examination, Damante testified that he heard his father say, "Chris." On cross-examination, defense counsel elicited the testimony identifying the person Damante knew as "Chris" to be the person who pushed Damante back into his room. Then on redirect, when the State asked Damante whether he saw the person he knew as "Chris" in the courtroom, Damante identified Trotter. Damante testified that Trotter was at his house the night his mom and dad were killed. On re-cross, defense counsel questioned Damante again about whether Trotter was the man who pushed him back into his room. Trotter's counsel then attempted to distinguish the man who pushed Damante from the man who struggled with Wallace on the stairs, asking:

"[Defense Counsel:] Q. Just so we're clear, you're telling—in response to the prosecution's questions, you're telling the jurors that the person you saw push you back in the room, that's the Chris you're identifying?

"[Damante:] A. Yes."

Damante's identification of Trotter as the man who pushed him back into his room directly contradicts Eddington's testimony that

Eddington was the man who pushed Damante back into his room. During closing argument, Trotter's counsel highlighted this contradiction, noting, "Both of these identifications cannot be correct. Those two witnesses directly contradict each other. . . . It's very clear he's not talking about Chris Trotter. He's talking about Kevin Eddington."

To establish reversible error, Trotter must demonstrate that there is a real possibility that the jury would have rendered a different verdict if the trial court had given the eyewitness identification instruction from PIK Crim. 3d 52.20. See *Mann,* 274 Kan. at 677. Trotter has failed to make that showing. His trial counsel actively pursued Damante's in-court identification, knowing that it would be contradicted by Eddington's testimony. Trotter's counsel also thoroughly attacked Damante's identification, highlighting Damante's inability to identify Trotter the day after his parents were murdered. Here Damante was familiar with Trotter, and his identification was thoroughly challenged during the trial; there is no possibility that the jury would have returned a different verdict if the eyewitness identification instruction had been given. Therefore, the trial court did not err by not giving the unrequested eyewitness instruction.

## II. Admission of evidence that Huff was pregnant

Trotter argues that the trial court should not have admitted evidence that Huff was pregnant when she was murdered. Although Trotter generally objected to any evidence of Huff's pregnancy, he failed to object when Damante testified that he heard his mother say, "I'm pregnant. I swear to God it's in there."

As a general rule, all relevant evidence is admissible unless it is otherwise precluded by statute, constitutional prohibition, or court decision. K.S.A. 60-407(f). Relevant evidence is "evidence having any tendency in reason to prove any material fact." K.S.A. 60-401(b). "To establish relevance, there must be some material or logical connection between the asserted facts and the inference or result they are designed to establish." *State v. Marsh,* 278 Kan. 520, 530, 102 P.3d 445 (2004).

Trotter argues that Huff's pregnancy was irrelevant because it did not establish a material fact. The State, on the other hand, argues that evidence of Huff's pregnancy corroborates Damante's, Navarre's, and Eddington's testimonies. Damante testified that he heard his mom tell the men, "I'm pregnant." Navarre testified that he heard Huff scream, "I'm pregnant, don't hurt me, don't hurt me." Eddington testified that he noticed Huff was pregnant. Each of these witnesses had credibility issues.

Trotter impeached Damante's credibility by emphasizing the contradiction between Damante's misidentification of Trotter as the man that pushed him back into his room. Trotter impeached Navarre and Eddington by stressing their favorable plea agreements. We note that Huff's pregnancy was a common thread in each of their testimonies, corroborating some of the circumstances of the robbery and bolstering their credibility regarding what happened the night Huff and Wallace were murdered. There is a logical connection between Huff's pregnancy and the inference that Damante, Eddington, and Navarre were telling the truth. Under these circumstances, the evidence of Huff's pregnancy became relevant.

The evidentiary statute that applies to the admission of this evidence is K.S.A. 60-445, which gives the trial court discretion to exclude otherwise relevant evidence if its probative value is outweighed by the prejudicial effect. Because the trial court has the statutory discretion to exclude evidence, this court reviews the trial court's decision to admit the evidence using an abuse of discretion standard. Judicial discretion is abused when no reasonable person would take the view adopted by the trial court. The burden of proof is on the party alleging that discretion has been abused. *State v. Horn*, 278 Kan. 24, 39, 91 P.3d 517 (2004).

To demonstrate prejudice, Trotter points to the responses of potential jurors during voir dire. Trotter specifically highlights several potential jurors who expressed concerns about being prejudiced by Huff's pregnancy. However, none of these individuals made the petit jury that decided Trotter's case.

We note that all of the final jurors expressed a willingness to follow the court's instructions and to disregard Huff's pregnancy

when determining whether Trotter should be sentenced to death. Juror K.D. indicated that she would be able to put that out of her mind. Jurors W.H., W.D., M.A., V.S., C.R., C.H., L.M., W.T., B.H., C.K., R.T., C.S., and R.D. all indicated that they could follow the court's instructions and ignore Huff's pregnancy when considering the death penalty. Juror V.S. specifically stated that she would not consider it if she were told not to. Juror C.K. was the only juror that indicated some reservation, stating, "I can say that with my brain, but we would have to wait and see what my heart would say." The remaining two jurors, T.B. and J.M., did not specifically indicate an opinion regarding Huff's pregnancy. Neither the State nor Trotter questioned Juror T.B. or Juror J.M. on the subject of Huff's pregnancy. However, neither responded when Trotter's counsel asked if the potential jurors had a problem with that evidence.

Prior to hearing the evidence, each juror had indicated a willingness to follow the court's instructions in deciding this case. The court instructed the jury on the elements of the crimes. Huff's pregnancy was not included in the elements. After reviewing the record, it is clear that the jury was not prejudiced by Huff's pregnancy because it did not sentence Trotter to death. Trotter has failed to demonstrate to this court that he was prejudiced by the evidence of Huff's pregnancy. The trial court did not abuse its discretion by admitting evidence of Huff's pregnancy.

### III. Peremptory strikes to eliminate 9 of the 10 African-Americans from the jury

Trotter claims that he did not receive a fair trial by a jury of his peers because the State used 9 of its 16 peremptory challenges to eliminate 9 of the10 African-American potential jurors from the petit jury. Trotter struck the remaining African-American, leaving only one African-American as an alternate juror. To support this argument, Trotter relies on *Batson v. Kentucky*, 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712 (1986).

Reviewing the State's use of peremptory challenges for a *Batson* violation requires a three-step process:

1. The defendant must make a prima facie showing that the prosecutor has exercised peremptory challenges based on race. *State v. Washington*, 275 Kan. 644, 653-54, 68 P.3d 134 (2003).
2. If the showing has been made, the burden shifts to the State to articulate race-neutral reasons for striking the questioned jurors. *Washington*, 275 Kan. at 653-54.
3. The burden then shifts back to the defendant to establish purposeful discrimination, and the court must determine whether the defendant has met that burden. The ultimate burden of persuasion rests with the opponent of the strike. *Washington*, 275 Kan. at 653-54; *State v. Campbell*, 268 Kan. 529, 533, 997 P.2d 726 (2000) (citing *Purkett v. Elem*, 514 U.S. 765, 767-68, 131 L. Ed. 2d 834, 115 S. Ct. 1769 [1995]).

The trial court's determination of whether the defendant has shown purposeful discrimination is reviewed using an abuse of discretion standard. Under that standard, the reviewing court gives great deference to the trial court's actions because the findings turn on the trial court's evaluation of the prosecutor's credibility. Judicial discretion is abused when no reasonable person would adopt the trial court's view. *Washington*, 275 Kan. at 653-54.

After the State completed its 12 peremptory challenges for the primary jury, Trotter objected, claiming that the State was purposely eliminating African-American jurors. The trial judge ordered the State to articulate its reasons for the strikes. The trial judge then concluded that the State's reasons were race-neutral and denied Trotter's *Batson* challenge.

One factor to consider in determining whether the State's peremptory challenges are discriminatory is the presence of other members of the same minority on the jury and the failure of the State to remove such members when given the opportunity. *State v. Betts*, 272 Kan. 369, 396-97, 33 P.3d 575 (2001). Another factor is the percentage of a particular race on a panel when compared with the percentage on the petit jury. *State v. Campbell*, 268 Kan. at 535. Here, the State struck all but one of the potential African-American jurors from the panel. Trotter struck the remaining African-American, leaving only one African-American as an alternate

on the final jury panel. Looking at the numbers alone suggests discrimination existed in this case.

However, the trial court must avoid placing a determinative emphasis on any one factor. Although the trial court can objectively compare numbers or other facts, it must subjectively evaluate the credibility of the prosecutor as he or she explains the reasons for each challenged strike. 268 Kan. at 534-35.

In *State v. Alexander*, 268 Kan. 610, 1 P.3d 875 (2000), the State used its peremptory challenges to strike all four of the African-Americans from the jury. Although the defendant, who was also an African-American, complained that all the potential African-American jurors were struck because of their race, this court upheld the trial court's finding that the State's strikes were race-neutral. 268 Kan. at 620-22. Thus, under proper circumstances, the elimination of all African-Americans from the final jury is not determinative of this issue. The ultimate question is whether the State has purposely discriminated when exercising its challenges. *State v. Kleypas*, 272 Kan. 894, 1000, 40 P.3d 139 (2001).

To support his argument that the number of African-Americans stricken from the jury in this case is enough to require a new trial, Trotter relies on *Miller-El v. Cockrell*, 537 U.S. 322, 154 L. Ed. 2d 931, 123 S. Ct. 1029 (2003). The question before the United States Supreme Court in *Miller-El* was whether a certificate of appealability (COA) should be issued for Miller-El's federal habeas corpus petition. Miller-El was convicted of capital murder and sentenced to death in Texas. While his direct appeal was pending, the United States Supreme Court decided *Batson*. Miller-El then claimed that he did not receive a fair trial because the prosecution eliminated 10 of the 11 possible African-Americans from the jury when using its peremptory strikes. After ultimately losing his direct appeal and his state habeas proceedings, Miller-El filed a federal habeas petition, seeking review of his *Batson* claims. His federal habeas petition was also denied, and the federal district court denied Miller-El's application for a COA to appeal the denial. The *Miller-El* Court granted the COA because Miller-El presented a substantial showing that he was denied a constitutional right. 537 U.S. at 341.

Although the *Miller-El* Court did not determine whether the underlying *Batson* claim had merit, it noted that Miller-El provided evidence of disparate questioning for black and white potential jurors, shuffling by moving African-Americans to the back of the panel where they may escape voir dire altogether, and policies within the District Attorney's office to exclude African-Americans from juries. 537 U.S. at 331-35. The *Miller-El* court stated that the statistical evidence alone raised a debate on whether the strikes were based on race. It did not hold that statistics alone were legally conclusive on the matter. 537 U.S. at 342.

Miller-El's case returned to the Fifth Circuit Court of Appeals for review of his *Batson* challenge. *Miller-El v. Dretke*, 361 F.3d 849 (5th Cir. 2004). After the Fifth Circuit denied Miller-El's federal habeas petition, the United States Supreme Court granted certiorari, then reversed the Fifth Circuit and granted Miller-El's habeas petition based on his *Batson* challenge. *Miller-El v. Dretke*, 545 U.S. 231, 162 L. Ed. 2d 196, 125 S. Ct. 2317 (2005) (hereinafter *Miller-El II*).

The *Miller-El II* court did not rely solely on the number of African-Americans struck from the jury. Rather, the Court viewed the evidence cumulatively to conclude that the state courts' decisions were unreasonable and erroneous. 545 U.S. at 266. Thus, Kansas law requiring courts to objectively compare numbers or other facts and subjectively evaluate the prosecutor's credibility in making the strikes complies with the United States Supreme Court's approach in *Miller-El II*. No one factor is determinative. See *Campbell*, 268 Kan. at 535. Trotter's argument that this court should look solely at the number of stricken African-Americans from the jury panel is without merit.

To determine whether Trotter's *Batson* challenge has merit, this court must review the State's reasons for striking the potential African-American jurors, applying an abuse of discretion standard. See *Washington*, 275 Kan. at 653-54. The State gave the following reasons for its peremptory strikes of the challenged potential African-American jurors:

B.E.: She said she could not impose a death sentence.
R.H.: She said she could not impose a death sentence.

| G.L.: | Her brother was convicted of murder, and she believed that the criminal justice system has treated him unfairly. |
|---|---|
| D.C.: | He said he could not impose a death sentence. |
| C. M.: | He was struck for several reasons. First, he blamed police for the terrorist attacks on September 11, 2001. Second, C.M. did not believe the death penalty is right. Third, he stated that the death penalty should only be used in cases involving torture or children. |
| R.C.: | He was a pastor, and people in the clergy tend to be compassionate and forgiving. |
| J.C.: | He participated in a prison ministry and may have been unable to impose the death penalty because of his compassion. In addition, J.C. believed that minorities receive the death penalty more often than others. |
| C.P.: | He appeared disrespectful to the court because he wore sunglasses throughout voir dire. C.P.'s son had been convicted of shooting a police officer. In addition, C.P. indicated that he would hold the State to a higher burden than beyond a reasonable doubt for imposition of the death penalty. |

Trotter does not raise any specific arguments related to the State's strikes of B.E., R.H., or G.L..

### Venirepersons D.C. and C.M.

As to D.C. and C.M., Trotter argues that the State did not completely and accurately present the facts. If the defendant or the trial court do not correct errors in the prosecutor's statements of fact supporting his or her reasons for exercising peremptory challenges, these facts are considered to be true for purposes of determining whether the prosecutor set forth a race-neutral reason for the strike. *State v. Betts*, 272 Kan. at 396.

We have reviewed Trotter's argument that the prosecutor's reasons for striking African-American jurors are not supported by the facts. We find that argument is without merit. Trotter highlights D.C.'s general statement that he could follow the law. However,

D.C. explained that he was "mixed up" about the death penalty because of the contradiction between obeying the law and his belief that he should not judge another person. We note that, when the prosecutor asked D.C. if he believed the death penalty was a proper punishment, D.C. stated he did not know. These statements support the prosecutor's belief that D.C. was equivocal about the death penalty, and the reason for striking D.C. is race-neutral.

As to C.M., the record supports the prosecutor's claim that C.M. had undergone anger management counseling, blamed law enforcement for the terrorist attacks, and did not believe in the death penalty. Trotter points out that C.M. stated the counseling would not affect his ability to be fair and impartial. Trotter then argues that the State was required to probe more deeply into the effect of C.M.'s anger management counseling and his opinion regarding the police's responsibility for the terrorist attacks. We disagree.

For the proposition that the State has to ask questions directly related to the reason for its peremptory strikes, Trotter relies on *State v. Fischer*, No. 87,740, Court of Appeals unpublished opinion filed July 16, 2004. *Fischer* does not support that proposition. In noting the defendant's claim that the State had not asked *any* questions of the stricken minority jurors, the *Fischer* court observed that the failure to ask *any* questions "could give rise to an inference the strikes were racially motivated." (Emphasis added.) *State v. Fischer*, slip op. at 2. However, the *Fischer* court concluded that the claim was without merit because the State had asked questions of the stricken minority jurors. *Fischer* implies that the State must ask some questions about a potential juror before striking him or her.

Contrary to Trotter's argument, Kansas law does not require the State to present reasons that have a relationship to the case. *State v. Bolton*, 274 Kan. at 17. With C.M., it is possible that the State was concerned about C.M.'s anger management problems and his potential interactions with other jurors during deliberations. Nevertheless, the State's reason for striking C.M. is race-neutral.

### Venirepersons R.C. and J.C.

Next, Trotter argues that there is no support for the State's concern that R.C. and J.C. would not have voted for the death penalty. Both R.C. and J.C. were involved in Christian ministries—R.C. as a pastor and J.C. as part of a prison ministry. Trotter seems to argue that the State had to make a specific connection during its voir dire questioning between the potential jurors' ministries and their service as jurors. As previously noted, this argument is without merit. In addition, striking a potential juror because he or she is a minister or married to a minister is a facially neutral reason. *State v. Adams,* 269 Kan. 681, 685-86, 8 P.3d 724 (2000) (upholding strike because potential juror was married to a minister); *State v. Alexander,* 268 Kan. at 620 (concluding that the trial court was in the best position to assess the minister's demeanor when he said he felt he could not render a fair verdict because of his religious beliefs but later stated that he could perform his duty as a juror). The trial court did not abuse its discretion when it found the State's reasons for striking R.C. and J.C. to be race-neutral.

### Venireperson C.P.

Trotter argues that the State failed to ask follow-up questions linking C.P.'s sunglasses to its conclusion that C.P. was disrespectful to the court. Again, Trotter's claim that the State had to specifically inquire about the link between its stated reason and the possible effect on the potential juror's service is without merit. Such a proposition runs counter to Kansas law which does not require that the reason be related to the case, persuasive, or plausible. *Washington,* 275 Kan. at 654; *Bolton,* 274 Kan. at 17.

Body language and nonverbal messages can be considered facially neutral reasons for striking potential jurors. However, the trial court must be particularly sensitive when body language, alone, is advanced as a reason for striking a juror of a specific racial group. See, *e.g., State v. Dean,* 273 Kan. 929, 932, 46 P.3d 1130 (2002) (upholding a peremptory strike based on the prospective juror's eye contact with the defendant); *State v. Pink,* 270 Kan. 728, 732, 20 P.3d 31 (2001) (upholding State's strike of the only African-American juror because she smiled and nodded during

questioning about whether police could lie even though the defense counsel did not observe these actions by the potential juror); *State v. Arteaga*, 257 Kan. 874, 879, 896 P.2d 1035 (1995) (allowing State to strike a potential juror who immediately and affirmatively nodded his head when asked whether police could make mistakes); *State v. Poole*, 252 Kan. 108, 113-14, 843 P.2d 689 (1992) (affirming the State's peremptory strike of a potential juror who would not speak up and appeared disinterested); *State v. Hood*, 245 Kan. 367, 376, 780 P.2d 160 (1989) (concluding that the State's peremptory strike of a potential juror who sat with his arms crossed and seemed to have personal hostility toward the prosecutor based on his tone and facial expression was facially neutral).

The trial court was in a better position to judge C.P.'s behavior and the prosecutor's credibility regarding C.P.'s attitude toward the court. See *Alexander*, 268 Kan. at 620-21 (concluding there was no abuse of discretion because this court "had no way of knowing" the potential juror's demeanor or the State's subjective opinion of him). Moreover, C.P.'s sunglasses were not the only reason the State struck him from the jury. The State also struck C.P. because his son had been involved in shooting a police officer. The State's reasons for striking C.P. are race-neutral.

Trotter further argues that the trial court should have granted his *Batson* challenges because there were nonminority jurors with the same characteristics as the stricken African-Americans. We have stated that the State's failure to strike a white juror with similar characteristics as a stricken minority juror is circumstantial evidence of purposeful discrimination. We then noted that, although this kind of circumstantial evidence may be sufficient to prove that the State's race-neutral reason was pretextual, it is not conclusive evidence as a matter of law. The trial court is required to evaluate the prosecutor's credibility in giving the explanation for striking a minority juror; this evaluation is entitled to great deference upon review. *Bolton*, 274 Kan. at 18-19. However, it is not the trial court's duty *sua sponte* to compare the characteristics of the final jurors with the characteristics of the people who were stricken. The defendant has the burden to create the record of relevant facts and

to prove his or her case to the trial court. *State v. Campbell*, 268 Kan. at 535.

Although Trotter discusses the characteristics of other jurors in his brief, he only brought Juror W.D. to the trial court's attention when he raised the *Batson* challenges. Trotter's attorney stated, "I'm not going to go through in detail, but I specifically note [Juror W.D.] from Panel B expressed the same kind of reservations." Trotter's attorney failed to explain what he meant by "the same kind of reservations." We have reviewed Trotter's claims, and they have no merit.

IV. Insufficiency of evidence to support Trotter's convictions

For his final issue, Trotter claims that the evidence was insufficient to support his murder convictions.

" 'When the sufficiency of the evidence is challenged in a criminal case, the standard of review is whether, after review of all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt.' [Citation omitted.]" *State v. Calvin*, 279 Kan. 193, 198, 105 P.3d 710 (2005).

Trotter argues that there was no evidence as to who actually shot Huff and Wallace. Because the State did not proceed on an aiding and abetting theory, Trotter argues that he cannot be convicted unless the evidence proved beyond a reasonable doubt that he was the actual shooter. Trotter then notes that the only witnesses that named him as the shooter were his codefendants who had entered into plea bargains which required them to testify that he was the shooter in return for significantly reduced sentences. Trotter asserts that, under this circumstance, the police encouraged his codefendants to identify Trotter as the shooter. This resulted in his codefendants meeting together while in custody and colluding against him. Trotter then argues that because their stories are inconsistent, the codefendants concocted the story so as to comply with the plea bargains and the police officers' requirement that they implicate Trotter. Trotter's argument essentially questions the codefendants' credibility and bias.

However, this court does not reweigh the evidence or pass on the credibility of witnesses. *State v. Bledsoe*, 272 Kan. 1350, 1359,

39 P.3d 38 (2002); see also *State v. Green*, 260 Kan. 471, 477, 920 P.2d 414 (1996) (rejecting defendant's claim that the evidence was insufficient because the witnesses' testimony was inconsistent or incredible). After reviewing the record, we find that this claim is without merit.

Affirmed.

LOCKETT, J., Retired, assigned.