No. 95,673

STATE OF KANSAS, *Appellee*, v. TERRY SCOTT-HERRING, *Appellant*.

(159 P.3d 1028)

Opinion filed June 8, 2007.

*Michelle A. Davis*, of Kansas Appellate Defender Office, argued the cause and was on the brief for appellant.

*Kristi L. Barton*, assistant district attorney, argued the cause, and *Nola Tedesco Foulston*, district attorney, and *Paul J. Morrison*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

ROSEN, J.: Terry Scott-Herring appeals his conviction for first-degree, premeditated murder, claiming that the district court erroneously admitted evidence and improperly instructed the jury; that the prosecutor committed misconduct; and that he was denied a fair trial by cumulative errors.

Scott-Herring was convicted of murdering his 23-year-old girlfriend, Mutindi Wanjiku Njoroge, or Jiku as she was known to her friends. Police officers found Jiku dead in the driver's seat of her car at approximately 2:35 a.m. on April 24, 2004. The officers found Jiku's car parked along a residential street with the lights off and the engine running. Jiku had been shot twice in the forehead. She had also been stabbed several times near her right ear.

Crime scene investigators found a wallet with Terry Scott-Herring's driver's license in the center console of Jiku's car. The console also contained love letters from Jiku to Scott-Herring and a kitchen-style steak knife. On the floorboard near Jiku's foot, officers found an empty condom wrapper and a man's gold nugget ring. Although they did not find a gun or any cartridge casings inside the car or in the vicinity of the car, they retrieved a bullet from the driver's door.

Police notified Jiku's mother, Rosemary Njoroge, who informed them that she had received a strange call from Scott-Herring's mother, Barbara Becknell, at about 2:40 to 2:45 a.m. the same morning. Barbara said she was calling to find out if Jiku was home. According to Barbara, Jiku had left Barbara's house an hour earlier and had promised to call when she got home to say she was safe. Barbara told Jiku's mother that Jiku had just called her to say she was home safe. Barbara, however, was concerned because the number on her caller ID was unlisted rather than Jiku's number. Jiku's mother told Barbara that Jiku was not home.

Police initially suspected Napoleon Sanchez, Scott-Herring's cousin, because Jiku had applied for a protection from abuse (PFA) order against Napoleon 3 days before she died. Napoleon and Jiku dated for several months until March 2004, when Napoleon left Wichita to visit his father in California. Napoleon and Jiku had a violent relationship marked by verbal and physical altercations.

While Napoleon was in California, Jiku began dating Scott-Herring. Napoleon returned to Wichita a few days before Jiku was killed and was angry about the breakup with Jiku. Three days before Jiku was murdered, Napoleon hit Jiku in the face and told her he would kill her, causing Jiku to seek the PFA.

The day before the murder, Jiku told her mother that she was afraid Napoleon would kill her and that she was going to hide from him at a girlfriend's house. Jiku also went to the police station and asked them to serve the PFA on Napoleon because he had a gun and she was afraid he would kill her.

Because of Scott-Herrings' friendship with Napoleon, police decided to interview him. After their interview with Scott-Herring, the police eliminated Napoleon as a suspect. According to Scott-Herring's statement, Napoleon had an alibi for the time of the shooting. Napoleon was with a group of people at another location. Police later confirmed this information with other witnesses.

However, Scott-Herring told police that Jiku was with him the day before and the night she died. They had driven Jiku's car to a friends' house, and Jiku waited in the car while Scott-Herring went inside and made arrangements with Napoleon and his friend, Jerell, to meet some girls from Salina later that night. Scott-Herring then took Jiku to his mother's house and left her there while he drove her car back to pick up Napoleon and Jerell.

Scott-Herring told police that he and his friends, Napoleon and Jerell, were planning to party with some girls from Salina at a vacant house two doors down from Barbara's house known as the Red House. Scott-Herring told police that he drove Napoleon back to the Red House, and Jerell followed them in another car with the girls from Salina. Instead of going inside the Red House with the rest of the group, Scott-Herring walked to his mother's house to return Jiku's car keys. While at his mother's house, Scott-Herring got into an argument with Jiku about the car. Scott-Herring and Jiku both got in the car and drove around. Things calmed down and Scott-Herring and Jiku began to express physical affection for one another. However, the two then resumed arguing when Scott-Herring refused to spend the night with Jiku and wanted to take her car to go party with his friends and the girls from Salina at the

Red House. Scott-Herring told the police that he got out of Jiku's car at another friend's house, where he hung out for about 20 minutes. Scott-Herring and his friend then walked to the Red House, where they saw Napoleon and Jerell outside with two girls from Salina.

The State charged Scott-Herring with one count of first-degree, premeditated murder. At trial, Napoleon testified that he had given Scott-Herring an old Smith and Wesson .38 caliber revolver before he left for California. Over Scott-Herring's objection, Napoleon identified a photograph of Scott-Herring holding the gun and testified that Scott-Herring had the gun with him on the night Jiku was murdered. Another witness also testified that she saw Scott-Herring with a gun the week before Jiku's murder and identified the gun as the same gun Scott-Herring was holding in the photograph. A firearms expert testified that Jiku was killed by a .38 Special caliber bullet that could have been fired from four types of revolvers, two Smith and Wesson models and two models of a Brazilian-made Smith and Wesson clone. The firearms expert further testified that the general appearance of the gun in the photograph was similar to the four types of guns that could have shot the .38 Special caliber bullet that killed Jiku.

Scott-Herring attempted to create reasonable doubt by pointing to Jiku's fear of Napoleon and arguing that Napoleon was Jiku's killer. Unpersuaded by Scott-Herring's defense, the jury found him guilty of first-degree, premeditated murder. The district court sentenced Scott-Herring to life in prison. The matter is before us on Scott-Herring's direct appeal pursuant to K.S.A. 22-3602(b)(1).

## ANALYSIS

*Admission of the photograph*

Scott-Herring claims that the district court erroneously admitted a photograph of him holding a .38 caliber revolver. Scott-Herring objects to the admission of the photograph because the State did not admit the murder weapon. According to Scott-Herring, the photograph was unduly prejudicial because the State could only speculate that it was the murder weapon.

The first consideration in reviewing the admission of evidence is relevance. *State v. Baker*, 281 Kan. 997, 1008, 135 P.3d 1098 (2006). Generally, all relevant evidence is admissible unless it is otherwise precluded by statute, constitutional prohibition, or court decision. K.S.A. 60-407(f). Relevant evidence is defined as "evidence having any tendency in reason to prove any material fact." K.S.A. 60-401(b). Relevance is established by some " 'material or logical connection between the asserted facts and the inference or result they are designed to establish.' " *State v. Trotter*, 280 Kan. 800, 809, 127 P.3d 972 (2006) (quoting *State v. Marsh*, 278 Kan. 520, 530, 102 P.3d 445 [2004]).

Once relevance is established, the district court applies the evidentiary rules governing the admission and exclusion of evidence either as a matter or law or in the district court's discretion depending on the contours of the rule in question. *Baker*, 281 Kan. at 1008. Scott-Herring asserts that the applicable evidentiary rule is K.S.A. 60-445, which gives the district court discretion to exclude otherwise relevant evidence because its probative value is outweighed by its prejudicial effect. Because the statute gives the district court discretion in admitting or excluding evidence, this court must review the district court's decision using an abuse of discretion standard. *Trotter*, 280 Kan. at 810. Judicial discretion is abused when no reasonable person would take the view adopted by the district court. The party alleging an abuse of discretion bears the burden of proving such abuse. 280 Kan. at 810.

Crime scene investigators discovered a bullet in the driver's door of Jiku's car. A firearm and toolmark examiner identified the bullet as a .38 Special and testified that, according to the FBI database, it could have been fired by four different guns: a .38 Special caliber Smith & Wesson, model 12; a .38 Special caliber Smith & Wesson, victory model; a .38 Special caliber INA, model 3; or a .38 Special caliber INA, model 1. All of these guns are revolvers manufactured before 1958. The firearm and toolmark examiner further testified that the gun Scott-Herring was holding in the photograph was a revolver and the general appearance of the gun was consistent with the four guns that could have fired the bullet found in Jiku's car. However, the firearm and toolmark examiner testified that he

could not positively identify the gun in the photograph as the murder weapon without having the actual gun.

Napoleon testified that he had given Scott-Herring an old, rusty Smith and Wesson .38 caliber revolver sometime in March before Napoleon went to California. One of Jiku's friends testified that she saw Scott-Herring with the gun shown in the photograph the week before Jiku died. Napoleon testified that he had seen Scott-Herring with the gun in the photograph on the night of Jiku's death.

The photograph of Scott-Herring with the gun is relevant to establish his possession of a gun resembling the possible murder weapon on the night of Jiku's murder. Scott-Herring argues the "whole line of inquiry was too speculative to have any relevance." However, the State was not required to prove that the gun in the photograph was the actual murder weapon for the evidence to be admissible. If there is testimony indicating a sufficient similarity between the weapon used to commit the charged crime and a weapon shown to be in the defendant's possession, "the lack of testimony positively identifying the weapon as that used in the crime goes to the weight, not the admissibility, of the evidence." *State v. Trammell*, 278 Kan. 265, 282, 92 P.3d 1101 (2004) (allowing witnesses to testify that a gun found in the defendant's possession resembled the gun that had been used during an armed robbery). Scott-Herring attacked the weight of the evidence by cross-examining the witnesses to highlight the State's inability to positively identify the gun in the photograph as the murder weapon. We find no abuse of the district court's discretion in admitting the photograph. Accordingly, this claim of error has no merit.

*Voluntary manslaughter instruction*

Scott-Herring argues that the district court erroneously instructed the jury regarding voluntary manslaughter because the district court added the following italicized language to the PIK Crim. 3d 56.04(e) instruction defining heat of passion:

"Heat of passion means any intense or vehement emotional excitement which was spontaneously provoked from circumstances. Such emotional state of mind

must be of such degree as would cause an ordinary person to act on impulse without reflection. *The provocation must consist of more than mere words or gestures."*

We need not address Scott-Herring's complaint because any error regarding the heat of passion instruction is immaterial to Scott-Herring's conviction. " '[W]hen a defendant is charged with and convicted of murder in the first degree, the correctness of instructions relating to manslaughter becomes immaterial.' " *State v. Horn*, 278 Kan. 24, 43, 91 P.3d 517 (2004) (quoting *State v. Metcalf*, 203 Kan. 63, 67, 452 P.2d 842 [1969]). Scott-Herring was charged with first-degree murder. The district court instructed the jury on second-degree murder and voluntary manslaughter as lesser included crimes. Nevertheless, the jury convicted Scott-Herring of first-degree murder, so any error in the voluntary manslaughter (heat of passion) instruction was immaterial.

*Prosecutorial Misconduct*

Scott-Herring asserts that the prosecutor committed misconduct when he improperly advised the jury to consider first-degree, premeditated murder before considering the lesser included crimes. Scott-Herring complains of the following comments during the State's closing argument:

"You also have a couple of other elements instructions, second-degree murder [and] voluntary manslaughter. Well, this is kind of a linear analysis, ladies and gentlemen. You first analyze first-degree murder. You make your decision on that. After analyzing first-degree murder, if you do not find that it exists, only then do you move on. Only then do you start to analyze second-degree murder and at the same time analyze voluntary manslaughter."

Issues of prosecutorial misconduct are reviewed using a two-step analysis. First, the court must determine whether the prosecutor's comments were outside the wide latitude prosecutors are allowed in commenting on the evidence. If so, the court must then determine whether the comments are plain error. *State v. Hurt*, 278 Kan. 676, 680, 101 P.3d 1249 (2004).

When the jury is instructed on lesser included crimes of first-degree murder, the jury should first determine whether the State has proven first-degree murder. If the jury agrees that the State

has proven first-degree murder, it does not have to consider the lesser included crimes. See *Hurt*, 278 Kan. at 682-83; PIK Crim. 3d 56.02-A; PIK Crim. 3d 56.03(B); PIK Crim. 3d 56.05(B).

According to Scott-Herring, the prosecutor's statements required the jury to unanimously acquit him on the greater offense before considering the lesser offenses. Scott-Herring relies on *Hurt* to support his argument. In *Hurt*, the prosecutor advised the jury as follows:

"It's only if you're not convinced, all 12 of ya, that he's guilty of premeditated, and then you move your way down and ask yourself, Well, certainly, he intended to but maybe it wasn't premeditated." 278 Kan. at 680.

The *Hurt* court found that the prosecutor's comments were ambiguous and potentially subject to the interpretation that everyone had to find reasonable doubt about premeditated murder before the jury could consider any lesser included crimes. 278 Kan. at 682. Because requiring the jury to unanimously acquit on first-degree murder before considering lesser included crimes misstated the law, the *Hurt* court concluded that the prosecutor's comment was outside the wide latitude prosecutors are allowed in making closing argument. 278 Kan. at 684. Nevertheless, the *Hurt* court found no ill will in the prosecutor's comments. 278 Kan. at 685. Noting that the defendant had been convicted of first-degree, premeditated murder, the greater crime, the *Hurt* court held that any error was harmless because the jury had been properly instructed on how to consider the lesser included crimes in accordance with the PIK instructions. 278 Kan. at 685-86.

This case is factually distinguishable from *Hurt*. The prosecutor in this case did not specifically state or even imply that all 12 jurors had to acquit Scott-Herring of first-degree, premeditated murder before considering the lesser included crimes. The prosecutor advised the jury to analyze first-degree, premeditated murder first and, if the State had failed to prove it, then move on to the lesser included crimes. The prosecutor's comments properly stated the law. Thus, they were not outside the wide latitude prosecutors are allowed during closing arguments, and there was no prosecutorial misconduct.

*Allen-type Instruction*

Next, Scott-Herring argues that the district court erred when it gave the pre-2005 version of PIK Crim. 3d 68.12 (instruction amended in 2005), which Scott-Herring characterizes as an *Allen-*type instruction, before the jury retired to begin deliberations. See *Allen v. United States,* 164 U.S. 492, 501-02, 41 L. Ed. 528, 17 S. Ct. 154 (1896). The instruction given encouraged the jury to make a decision, stating that "it must be decided sometime" and asserting that another trial would be a "heavy burden on both sides." Scott-Herring argues that this instruction misled the jury because the possibility exists that a defendant may never be convicted or acquitted. Instead, a defendant's case may terminate in other ways such as a dismissal by the State or the court or a dismissal due to a procedural error such as a speedy trial violation.

Scott-Herring objected to the instruction at trial. When a defendant objects to an instruction, this court applies the following standard of review:

" ' "When reviewing challenges to jury instructions, we are required to consider all the instructions together, read as a whole, and not to isolate any one instruction. If the instructions properly and fairly state the law as applied to the facts of the case, and a jury could not reasonably have been misled by them, the instructions do not constitute reversible error even if they are in some way erroneous." ' [Citation omitted.]" *State v. Makthepharak,* 276 Kan. 563, 568-69, 78 P.3d 412 (2003).

Although we have disapproved of using an *Allen-*type instruction when it is given after deliberations have begun, we have rarely reversed a defendant's conviction based on that error. See, *e.g., State v. Struzik,* 269 Kan. 95, 112, 5 P.3d 502 (2000); *State v. Troy,* 215 Kan. 369, 373, 524 P.2d 1121 (1974); *State v. Boyd,* 206 Kan. 597, 600-01, 481 P.2d 1015 (1971), *cert. denied* 405 U.S. 927 (1972); *State v. Oswald,* 197 Kan. 251, 260-61, 417 P.2d 261 (1966). We recently rejected Scott-Herring's argument in *State v. Anthony,* 282 Kan. 201, 215-16, 145 P.3d 1 (2006). Although the *Anthony* court applied a clearly erroneous standard because the defendant did not object to the instruction, its holding is phrased in terms of the standard that applies in this case as demonstrated by the following excerpt:

"Even if it is not literally inevitable that 'all cases . . . must be decided sometime,' inclusion of the quoted language in this instruction does not render it clearly erroneous. If the instructions properly and fairly state the law as applied to the facts of the case, and a jury could not reasonably have been misled by them, the instructions do not constitute reversible error even if they are in some way erroneous.[Citation omitted]" 282 Kan. at 216.

We recognize that the phrase "all cases . . . must be decided sometime" is not technically correct because a case may be resolved in any number of ways that do not involve a jury's verdict. However, we do not believe this technical error in the language warrants the reversal of Scott-Herring's conviction under our standard of review, which requires proper and fair instructions rather than technically perfect instructions. We note, however, that much of the concern with the instruction which was given in this case has been addressed and remedied by the PIK committee. PIK Crim. 3d 68.12, the deadlocked jury instruction, was modified by the committee in 2005, and now reads:

"Like all cases, this is an important case. If you fail to reach a decision on some or all of the charges, that charge or charges are left undecided for the time being. It is then up to the state to decide whether to resubmit the undecided charge(s) to a different jury at a later time. Another trial would be a burden on both sides.

"This does not mean that those favoring any particular position should surrender their honest convictions as to the weight or effect of any evidence solely because of the opinion of other jurors or because of the importance of arriving at a decision.

"This does mean that you should give respectful consideration to each other's views and talk over any differences of opinion in a spirit of fairness and candor. If at all possible, you should resolve any differences and come to a common conclusion.

"You may be as leisurely in your deliberations as the occasion may require and take all the time you feel necessary." PIK Crim. 3d 68.12 (2005 Supp).

The current version is a more accurate statement of a jury's responsibilities. Trial judges should discontinue using the pre-2005 version of PIK Crim. 3d 68.12.

*Cumulative errors*

Finally, Scott-Herring argues that he was denied a fair trial because of cumulative trial errors.

" 'Cumulative trial errors, when considered collectively, may be so great as to require reversal of the defendant's conviction. The test is whether the totality of circumstances substantially prejudiced the defendant and denied the defendant a fair trial. No prejudicial error may be found upon this cumulative effect rule, however, if the evidence is overwhelmingly against the defendant.' [Citations omitted.]" *Baker*, 281 Kan. at 1017 (quoting *State v. Engelhardt*, 280 Kan. 113, 140-41, 119 P.3d 1148 [2005]).

Scott-Herring relies on the other errors he has raised in this appeal to establish cumulative errors. Because we have found no errors, we find no basis for his claim of cumulative error and affirm his conviction of first-degree, premeditated murder.

Affirmed.