No. 92,870

STATE OF KANSAS, *Appellee*, v. LYNWOOD M. BAKER, *Appellant*.

(135 P.3d 1098)

Opinion filed June 9, 2006.

*Heather Cessna*, assistant appellate defender, was on the brief and argued the cause for appellant.

*David Lowden*, assistant district attorney, argued the cause, and *Kristi L. Barton*, assistant district attorney, and *Phill Kline*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

ROSEN, J.: Lynwood Baker appeals his conviction for first-degree premeditated murder for the shooting death of Gerard Fields, claiming that (1) the trial court erroneously allowed a police officer to testify regarding the credibility of another witness; (2) the jury should have been instructed about sympathy; (3) the jury should have been instructed on assisted suicide as a lesser included offense; (4) the trial court improperly excluded evidence of Baker's defense; (5) the prosecutor committed misconduct during the examination of a witness and closing arguments; (6) he was denied a fair trial by cumulative errors; (7) there was insufficient evidence to support his hard 50 sentence; (8) the hard 50 sentence is unconstitutional.

In July 2003, Gerard Fields was a bedridden paraplegic. His paralysis was a result of a bullet that lodged in his neck when he was shot at point-blank range approximately 11 years earlier. Gerard also suffered from cerebral palsy which increased his physical disability. He weighed about 99 pounds, was unable to care for himself, and lived in constant pain. Because of his disabilities, Gerard's mobility was severely limited. His hands were extremely weak. He could not reach out and grasp objects and had very little control over the movement of his fingers. Gerard could not hold an ink pen without assistance. He used his tongue to push the buttons on the television remote and the telephone because he could not push the buttons with his fingers.

In spite of all the hardships in his life, Gerard had a positive attitude. He struggled with bouts of depression from time to time, but, generally, he was in good spirits. Gerard never told his wife or his family that he wanted to die and never made any overtures about wanting to end his life.

Gerard was very close to his sister, Shelley Fields, who talked with him on a daily basis. Shelley was very protective and also a caregiver and companion of Gerard. At times, in order to ease his pain, she would help Gerard smoke marijuana.

Shelley began dating the defendant, Lynwood Baker, near the end of May or the beginning of June 2003. A short time later, Shelley introduced Baker to Gerard. Shelley told Baker that she and Gerard were very close and that Gerard was very special to her. Baker helped Shelley purchase marijuana for Gerard.

By early July 2003, Baker and Shelley's relationship deteriorated. Shelley had stated she had grown tired of Baker's lying and womanizing, so she stopped seeing Baker and refused to tell him where she could be reached. On July 11, 2003, Gerard called Shelley and told her that Baker had contacted him wanting to know Shelley's whereabouts. Shelley told Gerard that she had broken up with Baker and asked Gerard not to reveal where he could find her. Gerard agreed he would not tell Baker where Shelley could be found. Shelley then asked Gerard to make a three-way call to Baker, so she and Gerard could talk to him. During the call, Baker continued to ask about Shelley's whereabouts and became irate when she would not reveal her location. Shelley and Gerard hung up on Baker. Shelley asked Gerard not to talk to Baker anymore.

Later the same day, Baker and his girlfriend, Paishus Williams, drove over to Gerard's house in Baker's car. While Paishus remained in the car listening to loud music and attracting the neighbors' attention, Baker went inside Gerard's house. Inside the house, Baker went to Gerard's bedroom, argued with Gerard, and then shot Gerard point blank in the forehead, killing Gerard instantly.

Baker returned to the car and drove to a nearby gas station with Paishus. After getting gas, Paishus overheard Baker tell someone on the phone that "people are going to learn not to mess with me." Baker told Paishus the man was dead and he had to return to Gerard's house to find his shell casing. Paishus did not believe that the man was dead, so, when she and Baker returned to Gerard's house, Paishus went inside with Baker to see Gerard's body.

Paishus asked Baker why he had killed the man, and Baker responded, "He's been playing me." Paishus returned to the car. Baker followed a few minutes later, and the two went to Paishus' house.

Shelley heard that Gerard had been shot and went to Gerard's house. When she got there, a neighbor described Baker's car to Shelley, and she called the police to identify Baker. Shelley told the police that she was the reason Baker had killed Gerard.

Police officers found Baker at Paishus' house. While searching Paishus' house, police found the gun that killed Gerard. Police then escorted Baker and Paishus to the police station to interview them. Paishus initially denied going to Gerard's house, but eventually told police about going there with Baker and returning to see Gerard with a gunshot wound in his head. Paishus was released, and Baker was charged with first-degree premeditated murder for shooting Gerard.

At trial, Baker testified in his own defense, admitted being present when Gerard was shot, but denied killing Gerard. According to Baker, he was an unwitting accomplice to Gerard's suicide. Baker testified that he went to Gerard's house to retrieve a gun that Baker had left under Gerard's couch. After retrieving the gun, Baker went to Gerard's room to say hello. Gerard was very depressed and talked about wanting to die. Gerard asked Baker to show him the gun, and Baker complied. Baker testified that he thought he would bluff Gerard into changing his mind about committing suicide. Baker put Gerard's finger on the trigger and told Gerard to shoot himself. According to Baker, Gerard then leaned his head into the gun, said thanks, and pulled the trigger, killing himself before Baker knew what happened.

To contradict Baker's theory that Gerard committed suicide, the State called a firearms expert to testify that pulling the trigger required 12 pounds of pressure. Shelley and other witnesses for the State testified that Gerard was incapable of shooting himself because he was incapable of doing simple things like lighting a lighter, holding an ink pen, or pushing the buttons on the telephone or the television remote. Gerard's family members also testified that Gerard was not depressed and had not professed any suicidal ideation.

To rebut the State's evidence that Gerard was not suicidal, Baker attempted to admit testimony from a security guard who had worked at an assisted living center where Gerard resided in 2000. Baker proffered that the security guard would testify that Gerard was on a suicide watch in 2000. The State objected to the relevancy of the security guard's testimony, and the court sustained the objection, excluding the witness' testimony.

A jury convicted Baker of first-degree premeditated murder. Finding that Baker's actions were especially heinous, atrocious, or cruel because of Baker's indifference to Gerard's defenselessness, the district court sentenced Baker to life in prison with no possibility of parole for 50 years. Baker appeals his conviction and sentence to this court pursuant to K.S.A. 22-3601(b)(1).

### Witness Credibility

Baker claims that the trial court should not have allowed Detective Otis, who interrogated Paishus Williams, to comment on Paishus' veracity during the interrogation. Detective Otis testified that during the interrogation, he confronted Paishus because he knew she was lying when she said she was not at Gerard's house. However, Baker did not object to Detective Otis' testimony about Paishus' truthfulness. Failure to object to the admission of evidence at trial precludes raising the issue on appeal. K.S.A. 60-404; *State v. Kunellis*, 276 Kan. 461, 477, 78 P.3d 776 (2003); *State v. Arrington*, 251 Kan. 747, 750-51, 840 P.2d 477 (1992).

We have recognized three exceptions to the general rule precluding parties from raising new issues before an appellate court: (1) the newly asserted theory involves only a question of law on proved or admitted facts and will be finally determinative of the case; (2) consideration of the newly asserted theory is necessary to serve the ends of justice or prevent the denial of fundamental rights; or (3) the trial court's judgment may be upheld despite its reliance on the wrong reason or basis for its decision. *State v. Schroeder*, 279 Kan. 104, 116, 105 P.3d 1237 (2005).

Baker asserts that this court must consider Detective Otis' testimony regarding Paishus' credibility because addressing the issue would serve the ends of justice and prevent the denial of his fun-

damental right to have a jury determine his guilt. Baker argues that Paishus' credibility was crucial to the determination of his guilt or innocence.

However, Baker's argument overstates the impact of Paishus' testimony. Baker admitted arguing with Gerard and holding the gun when Gerard was shot. The key factual issue was the credibility of Baker's suicide story or the State's theory that Gerard was physically and emotionally incapable of committing suicide. Paishus' testimony did not assist the jury in making this factual determination.

The most damaging part of Paishus' statement to Detective Otis occurred when she said that Baker returned to Gerard's house to find the shell from his gun. At trial, Paishus interpreted Baker's statement to mean that he wanted to find his "Shell," Shelley Fields. Baker reinforced Paishus' testimony by testifying that he was referring to Shelley Fields when he said he needed to find his "Shell." However, this statement does not necessarily support the inference that Baker murdered Gerard and wanted to retrieve incriminating evidence. It is also consistent with Baker's theory that he would have been suspected of murder if the police had found his bullet shell even though Gerard committed suicide.

Although Paishus' testimony placed Baker at the scene of Gerard's death, she was not present when the shooting occurred and did not testify about what happened between Baker and Gerard. Her testimony is consistent with both the State's theory that Baker shot Gerard and Baker's theory that Gerard committed suicide using Baker's gun. Consequently, the jury's consideration of Paishus' credibility could not have been crucial to its determination of Baker's guilt or innocence. Because the jury's determination turned on evidence other than Paishus' testimony, Baker's argument that this court must address Detective Otis' testimony to prevent the denial of a fundamental right is without merit.

Baker failed to object to Detective Otis' testimony and none of the three exceptions for raising a new issue on appeal apply. As a result, he has failed to preserve the issue, and we will not address the merits of his claim.

*Jury Instruction for Sympathy*

Baker argues that the trial court should have given the jury the following sympathy instruction that he requested at trial: "You must consider this case without favoritism or sympathy for or against either party. Neither sympathy nor prejudice should influence you." PIK Crim. 3d 51.07.

When considering the trial court's refusal to give an instruction requested by the defendant, an appellate court reviews the evidence in a light most favorable to the defendant. A trial court is required to instruct the jury on the law applicable to the defendant's theories if there is evidence to support the theories. *State v. Holmes*, 278 Kan. 603, 634, 102 P.3d 406 (2004).

The pattern sympathy instruction formerly found in PIK 51.07 has been disapproved for general use and deleted from the Pattern Instructions. PIK Crim. 3d 51.07; *State v. Sully*, 219 Kan. 222, 226, 547 P.2d 344 (1976). The sympathy instruction should only be used under very unusual circumstances. *State v. Reser*, 244 Kan. 306, 316-17, 767 P.2d 1277 (1989).

Baker argues that there are unusual circumstances in this case because of Gerard's paraplegia, medical condition, extreme pain, and depression. He analogizes the facts in this case with those in *State v. Rhone*, 219 Kan. 542, 545, 548 P.2d 752 (1976), where this court found unusual circumstances to support a sympathy instruction.

In *Rhone*, the defendant was charged with aggravated burglary, felony theft, aggravated sodomy, and rape against two victims. The victim of the aggravated burglary and felony theft charges was extremely ill with cancer at the time of Rhone's trial. The victim's doctor testified that the victim would be unable to sit as a witness and the court should take the victim's testimony in her home. Consequently, the judge, jury, and all personnel associated with the trial traveled to the victim's home to hear her testimony. The defendant requested an instruction advising the jury not to give the victim's testimony any additional credibility because of the circumstances under which it was received, but the trial court refused the instruction. The *Rhone* court held that it was not error to deny the

defendant's instruction because the trial court had given the jury the sympathy instruction from PIK 51.07 and an instruction on witness credibility from PIK 52.09. *Rhone* is the only case where this court has found sufficiently unusual circumstances to support a sympathy instruction. See *Holmes*, 278 Kan. at 635; *Reser*, 244 Kan. at 317.

In *Reser*, the defendant was convicted of multiple counts of rape and sodomy against his 14-year-old stepdaughter. 244 Kan. at 306. Reser requested a sympathy instruction because of the disparity in age and size between himself and his victim and because the crimes occurred in a small town where it was likely the jurors were familiar with both Reser and his victim. The trial court denied Reser's request, and this court upheld that denial, finding that the circumstances were not unusual. 244 Kan. at 316-17.

In *Holmes*, the defendant was convicted of first-degree murder. During the trial, one or two of the victim's family members burst into tears and had to be escorted out of the courtroom. Believing that the jury had been influenced by the victim's family, Holmes requested a sympathy instruction. This court upheld the trial court's refusal to give the instruction, distinguishing the facts in *Rhone* and concluding that the incidents were brief and the circumstances were not unusual. 278 Kan. at 635-36.

Although the facts in this case are not analogous to those in *Rhone, Reser,* or *Holmes,* they are not sufficiently unusual to require the trial court to give a sympathy instruction. Moreover, we believe that Baker's request for a sympathy instruction was inconsistent with his defense. Baker exploited Gerard's paralysis, pain, and medical condition to support his claim that Gerard committed suicide. Thus, Baker was relying on the jury's sympathy for Gerard to convince them that Baker had helped Gerard by giving Gerard an opportunity to kill himself. In closing argument, Baker's counsel stated: "The worst thing he could have done to Gerard Fields was to let him lay in that bed like that. That's the worst thing he could have done to him. But he wasn't looking to hurt Gerard Fields, he considered Gerard Fields a friend."

We conclude that even when the facts are considered in a light most favorable to Baker, the trial court did not err when it denied his request for a sympathy instruction.

*Instruction for Assisted Suicide*

Baker claims that his conviction should be reversed because the trial court did not give an instruction for assisting suicide as a lesser included instruction for first-degree premeditated murder. A defendant is entitled to an instruction on lesser included offenses when the evidence would justify a jury verdict in accordance with the defendant's theory, even if the evidence is slight or supported only by the defendant's own testimony, and the evidence does not exclude a theory of guilt on the lesser included offense. *State v. Jackson*, 280 Kan. 16, 31, 118 P.3d 1238 (2005). When a defendant requests an instruction, the evidence is viewed in a light most favorable to the defendant's theory. 280 Kan. at 27.

The PIK instruction for assisting a suicide provides that the State must prove:

"That the defendant with the intent and purpose of assisting another person to commit or attempt to commit suicide knowingly:
a. provided the means by which another person committed or attempted to commit suicide; or
b. participated in a physical act by which another person committed or attempted to commit suicide." PIK Crim. 3d 56.08.

The State argues that assisting a suicide is not a lesser included offense of first-degree premeditated murder. Although Kansas courts have not determined whether assisting a suicide is a lesser included offense of first-degree premeditated murder, this court has considered whether the instruction should have been given. See *State v. Cobb*, 229 Kan. 522, 524-25, 625 P.2d 1133 (1981).

In *Cobb*, the defendant was convicted of first-degree premeditated murder. Cobb's friend, Henry Davis, told Cobb that he wanted to die. Davis procured enough cocaine to cause an overdose and provided Cobb with a gun to shoot him with in case the cocaine did not work. Davis inserted a syringe containing a large dose of cocaine in each arm, and Cobb pushed the plunger, injecting the drug into Davis' bloodstream. After Davis convulsed and gurgled for about 15 or 20 minutes, Cobb attempted to speed Davis' death by suffocating him with her hand over his mouth. Cobb could not determine whether Davis was dead, so she placed

the gun at Davis' temple and shot him in the head. 229 Kan. at 523-24.

Like Baker, Cobb requested an instruction on assisting a suicide as a lesser included instruction. Without addressing whether assisting a suicide is a lesser included offense of first-degree premeditated murder, the *Cobb* court concluded that the facts did not warrant an instruction on assisting a suicide because Cobb was an active participant in the overt act of shooting Davis, which caused his death. 229 Kan. at 525-26.

Like the *Cobb* court, we do not need to address whether assisting a suicide is a lesser included offense to first-degree premeditated murder because the facts in this case do not support giving the instruction. Assisting a suicide requires a specific intent to assist another person in committing suicide. The defendant must *knowingly* provide the means or participate in an act by which another person commits or attempts to commit suicide. See K.S.A. 2005 Supp. 21-3406; PIK Crim. 3d 56.08. Baker's testimony is the only evidence supporting Baker's contention that Gerard committed suicide. However, Baker's testimony does not support the *mens rea* elements for assisting a suicide. Baker testified that he did not intend for Gerard to kill himself. Baker further testified, "I wasn't expecting none of this to happen, period. That's what I'm trying to tell you. I thought about everything you're saying now, I wasn't expecting none of this to happen, none of it." This testimony negates the specific intent element required by the statute.

Because the evidence excludes the defendant's theory of guilt for assisting a suicide, we conclude that the trial court did not err when it refused to give the jury an instruction on assisting a suicide as a lesser included offense to first-degree premeditated murder.

### Exclusion of Evidence Supporting Baker's Defense

Baker claims that the trial court denied his right to a fair trial by excluding evidence in support of his defense. Baker sought to admit testimony from a security guard who had worked at an assisted living center where Gerard had been living about 3 years before his death. According to Baker's proffer, the security guard would have testified that Gerard was on a suicide watch during a portion

of his stay at the assisted living center. Following the State's objection for relevance, the trial court excluded the security guard's testimony because it was too remote in time to be relevant to the events that caused Gerard's death.

A defendant is entitled to present his or her theory of defense. The exclusion of relevant, admissible, and noncumulative evidence, which is an integral part of the theory of defense, violates the defendant's fundamental right to a fair trial. However, the defendant's right to present a defense is limited by the statutory rules of evidence and the case law interpreting those rules. *State v. Patton*, 280 Kan. 146, 156, 120 P.3d 760 (2005).

When reviewing a challenge to the admission of evidence, an appellate court first considers whether the evidence is relevant. 280 Kan. at 156. As a general rule, all relevant evidence is admissible. K.S.A. 60-407(f). K.S.A. 60-401(b) defines relevant evidence as "evidence having any tendency in reason to prove any material fact." Once relevance is established, the court must apply the evidentiary rules governing the admission and exclusion of evidence, either as a matter of law or in the exercise of the trial court's discretion, depending on the contours of the rule in question. *Patton*, 280 Kan. at 156.

Baker argues that the security guard's testimony that Gerard had been on a suicide watch approximately 3 years before his death is relevant to show that Gerard had contemplated suicide. The State, on the other hand, argues that the security guard's testimony is too remote in time to be relevant to Gerard's state of mind on the day of his death.

In *Patton*, the defendant was charged with murdering her husband. Patton claimed that her husband was a drug user who associated with drug dealers. According to Patton's theory of defense, her husband was killed by a third party with a drug-related motive. To establish this defense, Patton sought to admit evidence that her husband had connections with the girlfriend of a major drug dealer who had been killed about 11 or 12 years before her husband's murder. The *Patton* court concluded that the evidence was "tenuous, too remote in time, and more prejudicial than probative." 280 Kan. at 158.

A similar analysis applies in this case. The security guard's testimony regarding Gerard's state of mind approximately 3 years before his death is too remote or tenuous to establish Gerard's state of mind at the time of his death. Gerard had experienced a major change in his life since the security guard had observed him. Gerard had gotten married and moved out of the assisted care center into his wife's home. The security guard did not maintain contact with Gerard and could not testify about Gerard's state of mind at the time of his death. Because the security guard's testimony did not address Gerard's state of mind at or near the time of his death, we conclude that the testimony was not relevant to prove that Gerard was suicidal on the day he died. The trial court properly excluded the testimony from the security guard because it was irrelevant.

We further note that Baker was not prejudiced by the exclusion of this evidence. Even without the security guard's testimony, Baker was able to present evidence that Gerard was depressed and unhappy in his marriage. A police detective testified that Shelley said Gerard wanted to leave his wife and move in with her. Baker testified that Gerard was unhappy with his marriage and tired of being in pain. This testimony allowed Baker to present his theory of defense to the jury. The exclusion of the security guard's testimony did not deny Baker's right to a fair trial.

### Prosecutorial Misconduct

Baker asserts that prosecutorial misconduct denied him a fair trial. Baker points to the prosecutor's redirect examination of Shelley and his remarks during closing argument. We have grouped Baker's complaints into four categories, eliciting improper opinion evidence, commenting on facts not in evidence, commenting on the defendant's credibility, and appealing to the passions and prejudices of the jury.

"When reviewing an allegation of prosecutorial misconduct, an appellate court applies a two-step analysis to determine whether a prosecutor's comments have denied a defendant his or her constitutional right to a fair trial. First, the court must determine whether the remarks were outside the considerable latitude that the prosecutor is allowed in commenting on the evidence. Second, the court must decide whether the comments were so gross and flagrant as to prejudice the jury

against the defendant and deny him or her a fair trial, thereby constituting plain error requiring reversal." *State v. Harris*, 279 Kan. 163, 173, 105 P.3d 1258 (2005).

An appellate court applies the same approach to the defendant's claim that the prosecutor asked improper questions. First, the court must decide if the prosecutor's questions were relevant and supported by a good faith basis for believing the asserted matter to be true. If not, the court must determine whether the improper questions constituted plain error. *State v. Overton* 279 Kan. 547, 558, 112 P.3d 244 (2005).

In determining whether the prosecutor's questions or comments denied the defendant's right to a fair trial, the court must consider the following three factors:

"(1) whether the misconduct is so gross and flagrant as to deny the accused a fair trial; (2) whether the remarks show ill will on the prosecutor's part; and (3) whether the evidence against the defendant is of such a direct and overwhelming nature that the misconduct would likely have little weight in the minds of the jurors." *State v. Elnicki*, 279 Kan. 47, 64-65, 105 P.3d 1222 (2005).

*(a) Eliciting improper opinion evidence*

Baker first complains about the following questions the prosecutor asked Shelley on redirect examination:

"Q. You have—you weren't there when your brother was shot?
"A. No, I wasn't.
"Q. Do you know whether or not he committed suicide with a gun?
"A. I know my brother couldn't commit suicide with a gun."

Baker objected to Shelley's response, asserting that it was an opinion. The trial court instructed the prosecutor to rephrase the question, and the following colloquy occurred:

"Q. When you say you didn't know what happened, that's because you weren't there; is that right?
"A. Yes.
"Q. But you've testified previously that you just put two and two together and you knew what happened?
"A. Yes.
"Q. All right. What two and two did you put together?
"A. I put the fact that I had left town—"

Before Shelley could finish her response, Baker objected again on the basis of opinion, stating "it's a conclusion the jury should

be required to make." The trial court overruled the objection, and the following occurred:

"Q. What two and two did you put together?
"A. I put together the fact that I had left [Baker], he had no control over me and the only way the [Baker] could possibly hurt me was to hurt my brother, because he knew how much my brother meant to me."

Baker opened the door for the prosecutor's questions. On cross-examination, Baker's trial counsel elicited the following colloquy with Shelley:

"Q. Okay. So when you talked to Detective Carmody you —
"A. I told her who it was.
"Q. Okay. You were told that Mr. Baker had killed your brother, right?
"A. No, at that time she didn't tell me he'd killed my brother.
"Q. Why were you mad at him then?
"A. Because it doesn't take a rocket scientist to put two and two together and figure it out."

Baker's trial counsel continued, asking for the same opinion testimony that he now complains about on appeal:

"Q. Ms. Fields, do you have any idea why Mr. Baker would want to kill your brother?
"A. Because I left him and we were not together any more . . . and try to hurt me, because that's the only way he could hurt me/"

Baker's claim that Shelley should not have been allowed to testify regarding her opinion of the ultimate issue overlooks K.S.A. 60-456(d), which provides: "Testimony in the form of opinions or inferences otherwise admissible under this article is not objectionable because it embraces the ultimate issue or issues to be decided by the trier of the fact."

Pursuant to K.S.A. 60-456(d), the prosecutor's question regarding whether Shelley believed her brother committed suicide with a gun was not improper. Shelley's response addressed her opinion of Gerard's physical capability. As Gerard's sister and one of his caregivers, Shelley was familiar with Gerard's physical limitations. Besides expressing her opinion about Gerard's ability to shoot a gun, Shelley testified, without objection, regarding Gerard's physical limitations, stating that Gerard could not use his hands or fin-

gers to light a lighter or push the buttons on the television remote control.

Likewise, the prosecutor's questions regarding what two and two Shelley put together were not improper. The prosecutor's questions on redirect addressed the same testimony asked by Baker's trial counsel on cross-examination. Baker cannot complain about the prosecutor's questions after asking similar questions and eliciting similar responses during his cross-examination. See *State v. Flynn*, 274 Kan. 473, 505-06, 55 P.3d 324 (2002) (concluding there was no error in admitting witness' opinion regarding defendant's guilt because the codefendant's attorney elicited the same opinion evidence on cross-examination). Baker's claim of prosecutorial misconduct based on the prosecutor's redirect examination of the victim's sister is without merit.

*(b) Commenting on facts not in evidence*

Baker argues that the prosecutor did not confine his remarks to the evidence during closing argument. As a fundamental rule in closing arguments, prosecutors must confine their comments to matters in evidence. Commenting on facts not in evidence is clearly improper. However, a prosecutor is allowed considerable latitude in discussing the evidence and drawing reasonable inferences based on the evidence. *State v. Carter*, 278 Kan. 74, 80, 91 P.3d 1162 (2005).

Baker asserts that the prosecutor misstated the evidence twice during closing argument. The first instance occurred when the prosecutor argued that Baker entered Gerard's house armed with a gun. The second instance occurred when the prosecutor argued that Baker tried to bully Gerard into revealing Shelley's whereabouts and was killed because he was protecting Shelley.

Baker correctly argues that the prosecutor's comment regarding the gun is not supported by the evidence. Baker testified that he retrieved the gun from under Gerard's sofa before going into Gerard's bedroom. Because the prosecutor's statement is not supported by the evidence, it is beyond the wide latitude prosecutors are allowed in commenting on the evidence. However, to constitute reversible error, the misstatement of fact must be so gross and

flagrant as to deny the defendant a fair trial. See *Harris,* 279 Kan. at 173.

When the prosecutor misstates facts that are insignificant to the State's theory of the case, the error is not so gross and flagrant as to deny the defendant a fair trial. See *State v. Ly,* 277 Kan. 386, 394, 85 P.3d 1200, *cert. denied* 541 U.S. 1090 (2004) (holding that the prosecutor's misstatement of fact in the closing argument was not gross and flagrant because it was an insignificant part of the State's case); *State v. Gardner,* 264 Kan. 95, 106, 955 P.2d 1199 (1998) (concluding that improper closing remark regarding the location of key evidence was harmless error because the misstatement was made in passing and was not a significant part of the State's case). The prosecutor's statement regarding the gun was not significant to the State's theory of the case. The source of the gun was immaterial because Baker admitted taking the gun into Gerard's room and pointing it at Gerard. Moreover, the prosecutor rectified his factual misrepresentation about the gun later in his closing statements. Accordingly, we find no merit in Baker's argument that the prosecutor's misstatement about the gun denied him a fair trial.

Likewise, we find no merit in Baker's second argument that the prosecutor misrepresented the nature of Baker's confrontation with Gerard. The prosecutor argued that Baker killed Gerard because he refused to disclose Shelley's whereabouts. The prosecutor's argument is a reasonable inference based on facts admitted into evidence.

On the day he died, Gerard told Shelley that Baker had called him asking about her. Shelley told Gerard that she was through with Baker and did not want him to know her location. Shelley and Gerard then placed a three-way call to Baker. During the call, Shelley refused to tell Baker her location, and Baker became irate. After Shelley and Gerard hung up on Baker, Gerard continued his conversation with Shelley and told her that he would support her, stating, "I got your back, whatever you need me to do, I'm there for you." Baker admitted going to Gerard's house, retrieving a gun, arguing with Gerard, and pointing a gun at Gerard. Baker further testified that Gerard would not speak to him. Based on these facts

in evidence, it was reasonable for the prosecutor to infer that Gerard argued with Baker about Shelley's whereabouts and shot Gerard for refusing to cooperate with him and reveal where Baker could find Shelley.

### (c) Commenting on the Defendant's Credibility

Next, Baker argues that the prosecutor improperly commented on his credibility when he argued that Baker's story defies physics, it defies logic, and it certainly defies common sense. Baker argues that the prosecutor's argument is akin to calling him a liar. Baker relies on *Elnicki*, 279 Kan. 47, Syl. ¶ 3, and *State v. Hutcherson*, 25 Kan. App. 2d 501, 506, 968 P.2d 1109 (1998). However, his reliance on these cases is misplaced because neither case is factually on point.

In *Elnicki*, the prosecutor repeatedly called the defendant's story a tall tale, a yarn, and a fabrication and vouched for the complaining witnesses' credibility. 279 Kan. at 58-60. In *Hutcherson*, the prosecutor characterized the defendant as a liar, a criminal, and a drug dealer. 25 Kan. App. 2d at 506. The prosecutor in this case did not call Baker's story a yarn or a tall tale, did not vouch for the credibility of the State's witnesses, and did not call Baker a liar or a criminal.

Instead, the prosecutor pointed out the weakness in Baker's story by reminding the jury of Gerard's physical disabilities. The prosecutor noted that Gerard suffered from cerebral palsy and severe muscle atrophy such that he could not grip things with his hands, feed himself, write without assistance, or use his fingers to push buttons. The prosecutor contrasted Gerard's physical incapacity with testimony that pulling the trigger required 12 pounds of force.

In *State v. Moore*, 274 Kan. 639, 646-47, 55 P.3d 903 (2002), the prosecutor argued that the victim's testimony painted the defendant as a liar and none of the evidence indicated that the victim was lying. The *Moore* court concluded that the prosecutor's argument was within the considerable latitude allowed in discussing the evidence because it was the prosecutor's attempt to show that the defendant's version of the events was not feasible. 274 Kan. at 646.

Although the prosecutor in this case did not call Baker a liar like the prosecutor in *Moore*, his comments were aimed at demonstrating the infeasibility of Baker's story. Following *Moore*, we conclude that the prosecutor's comments regarding the feasibility of Baker's story were within the wide latitude prosecutors are allowed in discussing the evidence. Baker's argument fails to pass the first step in the test for prosecutorial misconduct, thus, we need not consider whether the comments were so gross and flagrant as to prejudice the jury against Baker and deny him a fair trial.

### (d) Appealing to the Passions and Prejudices of the Jury

Baker argues that the prosecutor improperly appealed to the passions and prejudices of the jury when the prosecutor argued: "Is it reasonable to doubt the defendant committed premeditated first-degree murder on this victim, Gerard Fields? No, it's not reasonable to doubt that. He is guilty of that."

Without citing any authority or asserting an argument, Baker concludes that [w]hen the prosecutor, as an officer of the State, stands up and, instead of asking the jury to find the defendant guilty, tells them instead that he is in fact guilty and that is unreasonable to think otherwise, the State has gone beyond the bounds of proper argument. Simply pressing a point without any supporting authority or without showing why it is sound without pertinent authority is akin to failing to brief an issue. When an appellant fails to brief an issue, the issue is waived or abandoned. *State v. Gleason*, 277 Kan. 624, 655, 88 P.3d 218 (2004). Consequently, we will not address this complaint.

Baker also asserts that the prosecutor appealed to the passions and prejudices of the jury by emphasizing Gerard's defenselessness and Baker's reliance on Gerard's sorrowful medical condition for his defense. The prosecutor argued:

"It's not enough for Lynwood Baker to walk in there and take the life of a man 99 pounds, who had no ability to protect himself, who was only trying to protect his sister, and take his life, it wasn't enough because to make [it] enough he has to come in here and take advantage with you of this man's sorrowful medical condition."

Prosecutors are not allowed to make statements that inflame the passions or prejudices of the jury or distract the jury from its duty to make decisions based on the evidence and the controlling law. *State v. Tosh*, 278 Kan. 83, 90, 91 P.3d 1204 (2005). Baker argues that the prosecutor's comments made the jury victims because Baker was trying to take advantage of them. However, this argument misinterprets the prosecutor's comment. The prosecutor did not state that Baker was trying to take advantage of the jury. Rather, the prosecutor stated that Baker took advantage of Gerard's sorrowful medical condition in front of the jury.

Baker relies on *State v. Eastridge*, 20 Kan. App. 2d 973, 894 P.2d 243 (1995), for the proposition that prosecutors cannot argue that the defendant is trying to take advantage of the jury. The *Eastridge* case does not support Baker's proposition. In *Eastridge*, the prosecutor characterized the defendant's alibi witnesses as liars and argued that it was unlikely that the State's witnesses had concocted their stories. Nevertheless, the *Eastridge* court concluded that the prosecutor's remarks did not deny the defendant a fair trial. 20 Kan. App. 2d at 982.

*Tosh* illustrates an example of prosecutorial comments that inflame the passions or prejudices of the jury. The prosecutor in closing arguments in *Tosh* stated that the victim had been raped a second time by having her character attacked at trial. The *Tosh* court concluded that the remark was outside the wide latitude prosecutors are allowed in discussing the evidence and reversed the defendant's conviction based on that remark and other incidents of prosecutorial misconduct. *Tosh*, 278 Kan. at 90, 98.

In *State v. Cravatt*, 267 Kan. 314, 335-36, 979 P.2d 679 (1999), the prosecutor commenting that the victim was 21 years old and would never live again, noted that the defendant shot the victim in cold blood, and stated, "Don't let him get away with it." The *Cravatt* court concluded that the prosecutor's comment was not improper because it asked "the jury to seriously consider the nature of the defendant's act toward the victim." 267 Kan. at 336.

In *City of Dodge City v. Ingram*, 33 Kan. App. 2d 829, 838, 109 P.3d 1272 (2005), the prosecutor argued that defense counsel thought the jury was stupid. On appeal, the prosecutor conceded

that his argument was improper. The *Ingram* court agreed, noting that the prosecutor's comment was inflammatory and prejudicial because it implied that defense counsel was trying to make fools out of the jury members. 33 Kan. App. 2d at 838. The *Ingram* court concluded that the comment was highly prejudicial and reversed the defendant's conviction. 33 Kan. App. 2d at 842.

Unlike the prosecutor's comments in *Tosh* and *Ingram*, the prosecutor's comments in this case do not accuse Baker of revictimizing Gerard with his closing arguments or implying that the jury members were foolish. Instead, the prosecutor's comments are more like those in *Cravatt*, demonstrating that Baker's story is dependent on Gerard's unfortunate medical condition and encouraging the jury to seriously consider the nature of Baker's actions toward Gerard. Thus, the prosecutor's comments are not outside the wide latitude allowed during closing argument, and we do not need to address the second step in the prosecutorial misconduct analysis. Baker's claim is without merit.

### Cumulative Error

Baker argues that his conviction should be reversed due to cumulative errors.

" ' "Cumulative trial errors, when considered collectively, may be so great as to require reversal of the defendant's conviction. The test is whether the totality of circumstances substantially prejudiced the defendant and denied the defendant a fair trial. No prejudicial error may be found upon this cumulative effect rule, however, if the evidence is overwhelming against the defendant." [Citation omitted.]' " *State v. Engelhardt*, 280 Kan. 113, 140-41, 119 P.3d 1148 (2005) (quoting *State v. Plaskett*, 271 Kan. 995, 1022, 27 P.3d 890 [2001]).

Baker has failed to demonstrate any trial errors in either the admission or exclusion of evidence, the jury instructions, or the prosecutor's conduct. Moreover, the evidence is overwhelming against him. Baker placed himself at the scene of Gerard's murder with the murder weapon in his hand. The sole issue was whether the jury believed Baker's story that he unintentionally assisted Gerard in committing suicide, or the State's story that Baker shot Gerard, who was physically incapable of shooting himself. This claim of error has no merit.

## Hard 50 Sentence

Having upheld Baker's conviction, we now turn to the issues he raises regarding his hard 50 sentence. Baker asserts that his hard 50 life sentence must be vacated because there is insufficient evidence to support the trial court's finding that Gerard's murder was committed in an especially heinous, atrocious, or cruel manner.

" 'When a defendant challenges the sufficiency of evidence for establishing the existence of an aggravating circumstance in a hard 50 sentencing proceeding, the standard of review is whether, after a review of all the evidence, viewed in the light most favorable to the prosecution, a rational factfinder could have found the existence of the aggravating circumstance by a preponderance of the evidence.' *State v. Buehler-May*, 279 Kan. 371, Syl. ¶ 12, 110 P.3d 425 (2005)." *State v. Washington*, 280 Kan. 565, 568, 123 P.3d 1265 (2005).

At Baker's sentencing hearing, the district court made the following finding:

"I have to tell you that [defense counsel]'s right, every homicide is a bad thing, but I have come to the conclusion that someone who would walk in and shoot a paraplegic through the head for any reason, someone who could not defend themselves, and for not—and without any good reason, frankly, that conduct constitutes conduct that is heinous and atrocious and cruel. And I'll so find."

In its journal entry of judgment, the district court stated, "Defendant's indifference to the defenseless nature of the victim constitutes conduct that is especially heinous, atrocious, and cruel" as an aggravating circumstance pursuant to K.S.A. 2005 Supp. 21-4636(f)(7).

Hard 50 sentences are authorized by K.S.A. 2005 Supp. 21-4635, which requires the court to weigh evidence of any mitigating circumstances against evidence of any aggravating circumstances. If the aggravating circumstances outweigh the mitigating circumstances, the court must sentence the defendant to serve a minimum of 50 years before being eligible for parole. K.S.A. 2005 Supp. 21-4635(d); K.S.A. 2005 Supp. 21-4638. The aggravating circumstances are set forth in K.S.A. 2005 Supp. 21-4636, which provides in pertinent part:

"Aggravating circumstances shall be limited to the following:
. . . .

"(f) The defendant committed the crime in an especially heinous, atrocious or cruel manner. A finding that the victim was aware of such victim's fate or had conscious pain and suffering as a result of the physical trauma that resulted in the victim's death is not necessary to find that the manner in which the defendant killed the victim was especially heinous, atrocious or cruel. In making a determination that the crime was committed in an especially heinous, atrocious or cruel manner, any of the following conduct by the defendant may be considered sufficient:

(1) Prior stalking of or criminal threats to the victim;

(2) preparation or planning, indicating an intention that the killing was meant to be especially heinous, atrocious or cruel;

(3) infliction of mental anguish or physical abuse before the victim's death;

(4) torture of the victim;

(5) continuous acts of violence begun before or continuing after the killing;

(6) desecration of the victim's body in a manner indicating a particular depravity of mind, either during or following the killing; or

(7) any other conduct in the opinion of the court that is especially heinous, atrocious or cruel."

Standing alone, the fact that the victim was killed by gunshots fired by the defendant is generally not sufficient to support a finding that the manner of death was especially heinous, atrocious, or cruel. See, *e.g.*, *State v. Holmes*, 278 Kan. 603, 608, 638-39, 102 P.3d 406 (2004) (reversing hard 40 sentence because firing a single shot through the victim's heart was not especially heinous, atrocious, or cruel); *State v. Flournoy*, 272 Kan. 784, 794, 36 P.3d 273 (2001) (holding that the defendant's act of shooting the victim five times within 1 minute was not especially heinous, atrocious, or cruel); *State v. Cook*, 259 Kan. 370, 401-03, 913 P.2d 97 (1996) (reversing hard 40 sentence because the defendant's act of shooting the victim twice was not especially heinous, atrocious, or cruel); *State v. Reed*, 256 Kan. 547, 562-63, 886 P.2d 854 (1994) (concluding that shooting the victim in the head was not especially heinous, atrocious, or cruel and other testimony supporting the finding amounted to conjecture and speculation but upholding the hard 40 sentence based on another aggravating factor).

In a few special cases, this court has found shooting deaths to be especially heinous, atrocious, or cruel. In *Washington*, 280 Kan. at 571-72, *State v. Conley*, 270 Kan. 18, 29, 11 P.3d 1147 (2000), *cert. denied* 532 U.S. 932 (2001), and *State v. Alford*, 257 Kan. 830,

838, 896 P.2d 1059 (1995), this court concluded that the shooting deaths were especially heinous, atrocious, or cruel when the victims attempted to flee after being shot and the defendants pursued the victims, continuing to shoot until the victims died. In *State v. Perry*, 266 Kan. 224, 234, 968 P.2d 674 (1998), this court found that the shooting death was especially heinous, atrocious, or cruel because the defendant waved the gun in front of his victims before shooting them and forced one of the victims to watch the defendant shoot her sister. In *State v. Brady*, 261 Kan. 109, 929 P.2d 132 (1996), the defendant forced two shooting victims to lie face down on the floor with their heads close together while he paced around the room for about 15 minutes holding a gun. The defendant shot the first victim in the head while the second victim watched and then shot the second victim in the head. The *Brady* court found that shooting the victims in this manner was especially heinous, atrocious, or cruel. 261 Kan. at 123-24.

The common thread running between *Washington, Conley, Alford, Perry* and *Brady* is evidence in the record of the infliction of mental anguish upon the victim prior to death. In 1999, subsequent to *Conley, Alford, Perry,* and *Brady,* the legislature specifically amended K.S.A. 2005 Supp. 21-4636(f) to include mental anguish in the list of conduct it considered to be heinous, atrocious, and cruel. L. 1999, ch. 138, sec. 1.

The district court in this case did not find Baker's conduct heinous, atrocious, or cruel based on the infliction of mental anguish pursuant to K.S.A. 2005 Supp. 21-4536(f)(3). Rather the district court found that Baker's conduct was heinous, atrocious, or cruel pursuant to K.S.A. 2005 Supp. 21-4636(f)(7) which includes "any other conduct" that the court finds to be heinous, atrocious, or cruel.

We acknowledge that there may be factual circumstances in which a defendant subjects a defenseless victim to mental anguish because the victim is conscious and aware that death is imminent but completely unable, by virtue of his or her physical condition, to defend him or herself. However, we agree with the district court that the facts of this case do not warrant such a finding. Any finding that Baker taunted, threatened, or terrorized Gerard with the gun

or that Gerard knew he was going to die prior to being shot requires us to speculate about facts that are not in evidence. We cannot entertain such speculation. There is simply no evidence in the record regarding Gerard's state of mind prior to being murdered.

In *Cook*, the defendant shot an AIDS patient while he was lying in bed. 259 Kan. at 396, 402. The State argued that the shooting was especially heinous, atrocious, or cruel because the victim was a defenseless AIDS patient. Finding the State's argument to be without merit, the *Cook* court vacated the defendant's hard 40 sentence, concluding that the shooting was not especially heinous, atrocious, or cruel. 259 Kan. at 402-03.

In *Reed*, the defendant took a heavily intoxicated, 16-year-old girl to a remote place in the country to rape her. 256 Kan. at 549, 556. When the victim struggled with the defendant, he shot her in the back of the head, then began to stab her in the neck, eventually severing her head. 256 Kan. at 556. The *Reed* court could not conclusively determine whether the victim was alive when the defendant stabbed and decapitated her, so it concluded that the shooting death was not especially heinous, atrocious, or cruel. 256 Kan. at 563. In reaching this conclusion, the *Reed* court did not consider the relative defenselessness of a heavily intoxicated, teenaged girl in a remote, unknown location. However, the *Reed* court did not reverse the defendant's hard 40 sentence, relying on other aggravating grounds to support it. 256 Kan. at 566.

The State relies on Gerard's medical condition and argues that Baker took advantage of a defenseless victim. We conclude that this argument has no merit in light of *Cook* and *Reed*. While we are struck by the cold and callous nature of this crime, we cannot focus on Gerard's defenselessness alone and speculate about what occurred or whether Gerard was aware of his imminent death. We must follow the general rule that shooting deaths are not especially heinous, atrocious, or cruel. Accordingly, we reverse the district court's hard 50 sentence and remand the matter for resentencing.

### Constitutionality of the Hard 50 Sentence

Baker also argues that his hard 50 life sentence is unconstitutional because it does not require a jury to find beyond a reasonable

doubt all of the facts necessary for increasing his penalty. However, Baker lacks standing to challenge the constitutionality of a statute that does not apply to him. See *Cross v. Kansas Dept. of Revenue,* 279 Kan. 501, 508, 110 P.3d 438 (2005) (stating that " '[a] party has standing to challenge the constitutionality of a statute only insofar as it has an adverse impact on his own rights' "). We have concluded that Baker's hard 50 sentence must be reversed. Thus, the hard 50 sentencing statute does not apply to him, and he has no standing to contest the constitutionality of the statute.

Conviction affirmed, sentence vacated, and case remanded for resentencing.