NOT DESIGNATED FOR PUBLICATION

No. 115,590

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

GABRIEL MUNOZ,
*Appellant*.

MEMORANDUM OPINION

Appeal from Seward District Court; BRADLEY E. AMBROSIER, judge. Opinion filed September 15, 2017. Affirmed in part, vacated in part, and remanded with directions.

*Kimberly Streit Vogelsberg*, of Kansas Appellate Defender Office, for appellant.

*Russell Hasenbank*, county attorney, and *Derek Schmidt*, attorney general, for appellee.

Before PIERRON, P.J., GREEN and HILL, JJ.

PER CURIAM: Gabriel Munoz was convicted by a jury of one count of rape; one count of aggravated burglary; one count of intimidation of a witness; and one count of criminal restraint. On direct appeal, Munoz argues (1) that the trial court committed reversible error in failing to provide a limiting instruction to the jury regarding evidence admitted under K.S.A. 60-455; (2) that the trial court erred in overruling his challenge under *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986); (3) that his sentence for intimidation of a witness was an illegal sentence; and (4) that the trial court erred in sentencing him to a term of lifetime postrelease supervision under K.S.A. 22-3717(d)(1)(G). We hold that Munoz' sentence for intimidation of a witness constituted

1

an illegal sentence. We reject the balance of Munoz' arguments. Accordingly, we affirm Munoz' convictions of rape, aggravated burglary, intimidation of a witness, and criminal restraint, vacate his sentence for intimidation of a witness, and remand for resentencing.

Munoz met R.R. through his cousin, Marcela, who worked with R.R. Marcela had shown R.R. a picture of Munoz. She also gave him R.R.'s telephone number. R.R. and Munoz texted back and forth. Finally, on August 24, 2014, R.R. invited Munoz to her home. She wanted to meet at her house because she had her 1-year-old son with her.

Munoz, Marcela, and Marcela's husband all went to R.R.'s house. Marcela's husband stayed in the car while Munoz and Marcela went inside to hang out. Eventually, Marcela left with her husband because it was getting late. Munoz stayed at R.R.'s house. He said he could walk home later.

After Marcela left, R.R. and Munoz watched a movie together. After the movie was over, they sat in R.R.'s living room and talked. Munoz told R.R. that he had recently been released from prison. R.R. told Munoz that had she known he had been in prison, she would not have invited him to her house. Munoz then tried to kiss R.R. She blocked her face with a car manual that she had nearby. Munoz told her, "You're a fighter, I like that, it makes me want you more." R.R. also put a pillow in front of her, but Munoz took the pillow away. Munoz then turned off the lights and laid down on top of R.R. She told Munoz, "This isn't working out, you need to leave." When R.R. told Munoz to leave, he slapped her.

Munoz got up, and R.R. went to the kitchen to figure out what to do. R.R. was crying. Munoz came into the kitchen and tried to grab R.R. She put a chair between them. R.R. then got her cellphone so she could call Marcela to come and pick up Munoz. Munoz told R.R. not to call anyone. R.R. then tried to call 911, but Munoz took the phone away from her.

2

Munoz asked R.R. why she had invited him over. She said that she wanted to hang out and talk. She told Munoz that she did not want to have sex with him. Munoz kept urging R.R. to go to bed with him. R.R. then placed her sleeping son on her bed so that Munoz would not want to go to bed. Munoz told R.R. to move her son. He told her that if she did not want to be his girlfriend, she would have to leave. R.R. moved her son back to his crib. After she moved her son, Munoz turned off the lights and laid down in R.R.'s bed with her. R.R. told him to leave her alone. She said that she needed to get up early for work the next morning. Munoz hugged her and told her that she would not get out of his arms. He told her that he would wake her up for work. R.R. again told Munoz to leave her alone. She also told him to leave her house.

Munoz then removed R.R.'s clothes. She told him to stop because she was not getting aroused. Munoz then tried to insert his fingers into R.R.'s vagina. She told Munoz that he was hurting her. She testified that it felt as though Munoz was attempting to put his fist inside her vagina. Munoz stopped using his fingers. He then attempted to insert his penis into R.R.'s vagina. He grabbed R.R.'s legs and opened them. R.R. told him that he was hurting her. Munoz penetrated R.R.'s vagina with his penis. While he was penetrating R.R., Munoz asked her if she wanted to be his girlfriend. When R.R. answered no, Munoz would penetrate her with more force.

When Munoz stopped, R.R. asked him if she could go to the restroom and change her son's diaper. R.R. got dressed, grabbed her son, and ran to her neighbor's house. While at her neighbor's house, the police were called. The police came and arrested Munoz in R.R.'s house.

R.R. was examined by a sexual assault nurse early in the morning of August 25, 2014. The nurse concluded that R.R.'s injuries were consistent with her claim that she had been forcibly raped.

3

On August 26, 2014, Munoz was charged with one count of rape; one count of aggravated burglary; one count of aggravated intimidation of a witness; one count of battery; and one count of criminal restraint. On October 20, 2015, Munoz was found guilty of one count of rape; one count of aggravated burglary; one count of intimidation of a victim; and one count of criminal restraint. The sentencing court found that Munoz had a criminal history score of A. He was sentenced to 620 months' imprisonment for the rape conviction; 32 months' imprisonment for the aggravated burglary conviction; 18 months' imprisonment for the intimidation of a witness conviction; and 12 months' imprisonment for the criminal restraint conviction. The sentences were run concurrent with one another. Munoz timely appealed.

*Did the Trial Court Commit Clear Error in Failing to Give a Limiting Instruction Relating to K.S.A. 60-455 Evidence?*

Munoz argues that the trial court committed reversible error when it failed to give a limiting instruction relating to K.S.A. 60-455 evidence admitted at trial.

Under K.S.A. 60-455 evidence of a defendant's prior crime is generally inadmissible. K.S.A. 2016 Supp. 60-455(a) states, "evidence that a person committed a crime or civil wrong on a specified occasion, is inadmissible to prove such person's disposition to commit crime or civil wrong as the basis for an inference that the person committed another crime or civil wrong on another specified occasion." More commonly stated, evidence of a defendant's prior crime cannot be used to show that the defendant has a propensity to commit crimes. Evidence of a defendant's prior crime is admissible, however, "when relevant to prove some other material fact including motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident." K.S.A. 2016 Supp. 60-455(b). Our Supreme Court has recognized that the material facts listed in K.S.A. 60-455 are not exhaustive, meaning a party can seek to admit evidence to prove

4

some material fact not specifically mentioned in the statute. *State v. McCune*, 299 Kan. 1216, 1226-27, 330 P.3d 1107 (2014).

Before trial, the State moved to admit the following evidence under K.S.A. 2016 Supp. 60-455: (1) R.R.'s testimony that Munoz told her that he had just been released from prison and that he was in a gang; (2) a law enforcement gang affiliation worksheet showing that Munoz was indeed in a gang; (3) statements that Munoz made to law enforcement officers about his gang affiliations; and (4) documentary evidence of Munoz' prior conviction.

After a hearing, the trial court "admitted (subject to other objection) any testimony coming from [R.R.] as to any statements [Munoz] made concerning gang affiliation or K.S.A. 60-455 evidence, which . . . formed the basis for the fear prong of the rape charge, or the basis for counts 3 and 5." Count 3 charged Munoz with aggravated intimidation of a witness or victim, and count 5 charged Munoz with criminal restraint. The trial court reasoned that "whether or not the statements of the Defendant to the victim were true or untrue is not particularly relevant. What will be relevant for the jury to determine is whether or not those statements were made and if so, did they render the victim overcome by fear."

The trial court "disallowed any evidence from law enforcement concerning the . . . supplemental [database] sheet to support gang activity." Finally, the trial court also disallowed any other evidence regarding Munoz' gang affiliation or prior conviction. The court ruled that "[e]xtrinsic evidence as to the truth or falsity of the actual statements is immaterial to any of the alleged facts of the crime and is therefore irrelevant and inadmissible."

At Munoz' trial, R.R. testified that Munoz told her that he had recently been released from prison. She also testified that Munoz told her that he had previously put

5

someone in the intensive care unit at the hospital when he beat the person up. The trial court did not give a limiting instruction relating to R.R.'s testimony regarding Munoz' statements.

Here, Munoz did not object to the failure to give the limiting instruction. The "failure to object to an instruction does not bar appellate review of the instruction. It does, however, raise the persuasive bar the complaining party must hurdle on appeal; the appellate court must be convinced the instruction is clearly erroneous." *State v. Breeden*, 297 Kan. 567, 581, 304 P.3d 660 (2013). An appellate court reviewing the failure to give a jury instruction that was not requested at trial employs the following analytical framework. First, the court must determine whether the trial court erred in failing to give the instruction. This step necessarily includes a determination of whether the instruction would have been legally and factually appropriate. The review for error presents a legal question subject to unlimited review. 297 Kan. at 571-72. If the appellate court determines that the trial court committed an error, then the appellate court proceeds to the reversibility inquiry. "[T]he current definition of clearly erroneous sets up the test to determine whether the instruction error requires reversal, *i.e.*, whether the reviewing court is firmly convinced that the jury would have reached a different verdict had the instruction error not occurred." 297 Kan. at 572. In evaluating whether the failure to give an instruction rises to the level of clear error, "[r]eversibility is subject to unlimited review and is based on the entire record. It is the defendant's burden to establish clear error under K.S.A. 22-3414(3). [Citation omitted.]" *State v. Betancourt*, 299 Kan. 131, 135, 322 P.3d 353 (2014).

*The Instruction was Legally and Factually Appropriate*

When a trial court admits evidence under K.S.A. 60-455, "the court must give a limiting instruction informing the jury of the specific purpose for admitting whatever

[K.S.A.] 60-455 evidence comes in." *State v. Riojas*, 288 Kan. 379, 383, 204 P.3d 578 (2009); see also *State v. Hart*, 297 Kan. 494, 511, 301 P.3d 1279 (2013) (same).

Here, the trial court admitted R.R.'s testimony under K.S.A. 60-455 but failed to provide a limiting instruction. The limiting instruction was legally and factually appropriate because it was required. Moreover, the State concedes on appeal that the trial court's failure to give the limiting instruction was error. Accordingly, the trial court erred in failing to give the instruction. We now move on to determine whether the error amounts to reversible error.

### *The Trial Court's Error was not Clearly Erroneous*

Under this step of our analysis, we must determine whether the trial court's error was clearly erroneous. To establish clear error, "'the defendant must firmly convince the appellate court that the giving of the instruction would have made a difference in the verdict.' [Citation omitted.]" *State v. Cooper*, 303 Kan. 764, 771, 366 P.3d 232 (2016).

As Munoz points out, our Supreme Court has delineated three types of prejudice that might result from the admission of evidence under K.S.A. 60-455:

> "'First, a jury might well exaggerate the value of other crimes as evidence proving that, because the defendant has committed a similar crime before, it might properly be inferred that he committed this one. Secondly, the jury might conclude that the defendant deserves punishment because he is a general wrongdoer even if the prosecution has not established guilt beyond a reasonable doubt in the prosecution at hand. Thirdly, the jury might conclude that because the defendant is a criminal, the evidence put in on his behalf should not be believed.'" *State v. Davis*, 213 Kan. 54, 58, 515 P.2d 802 (1973).

Munoz argues that without the limiting instruction, the evidence introduced at his trial subjected him to the first two risks listed in *Davis*. He argues that "the jury may have

based its verdicts on the notion that because [he] had committed crimes and been imprisoned in the past that he was a bad guy and thus more likely to have committed the crimes charged in the present case or that he was a general wrong doer [*sic*]."

A brief discussion of *Breeden* will show why Munoz' concerns do not rise to the level of clear error. Breeden was charged with and convicted of aggravated criminal sodomy. At trial, the victim, L.B., testified that Breeden had threatened to kill him. L.B.'s mother also testified that "L.B. told her Breeden had 'punched him in the stomach and threw him on the bed and held him down and started sucking his [penis].'" 297 Kan. at 575. On appeal, Breeden argued that L.B.'s and his mother's testimony was "evidence of prior crimes—criminal threat and battery—that is governed by K.S.A. 60-455 and this court's caselaw regarding application of that statute." 297 Kan. at 575. Breeden specifically argued that the trial court should have given a limiting instruction and its failure amounted to clear error. Our Supreme Court held:

> "[W]e are firmly convinced that the jury would not have reached a different verdict had a limiting instruction been given and, therefore, are not persuaded by Breeden's argument that the failure to give the instruction was clearly erroneous. In making this argument, Breeden notes the evidence of the threat was used by the State to explain, at least in part, the reason for L.B.'s initial reluctance to tell his mother what happened. But Breeden does not explain why, even if a limiting instruction had been given, the jury would not have been allowed to consider the evidence for this purpose. Additionally, Breeden complains that the State used the testimony of both the threat and the battery to paint Breeden 'as a violent person, one who could harm a child because he had threatened violence and backed it up with a punch.' While this danger exists, neither of the other crimes points specifically to a propensity to commit the charged crime of sodomy. Thus, neither of these points causes us to conclude Breeden was prejudiced." 297 Kan. at 584-85.

Here, the K.S.A. 60-455 evidence was admissible to prove an element of rape—fear. See K.S.A. 2016 Supp. 21-5503(a)(1)(A) ("Rape is . . . knowingly engaging in sexual intercourse with a victim who does not consent to the sexual intercourse . . .

[w]hen the victim is overcome by force or fear."). The trial court was clear that "[t]he State [was] free to [elicit] testimony and evidence concerning statements made to the victim which form[ed] the basis for her being overcome by fear for the rape charge, as well as any testimony that supports counts 3 and 5." Munoz has likewise failed to show that had the trial court given a limiting instruction, the jury would not have been allowed to consider the evidence for the stated purpose—as proof of R.R.'s fear. Additionally, the testimony elicited by the State here did not state with specificity what prior crimes Munoz had committed. The most specific statement elicited was that Munoz told R.R. that he had "put somebody in the ICU and he had beat up somebody really bad." Thus, the evidence did not support an inference by the jury that because Munoz had previously beat someone up, he had a propensity to commit the crimes he was charged with in the present case. Indeed, R.R.'s testimony was so nondescript that it could have only been used for the purpose for which it was admitted—to show that R.R. was placed in fear. As the trial court properly ruled, "[i]t [was] for the jury to determine whether the statements were made and whether the statements did in fact lead to the victim being overcome by fear, or intimidated or restrained."

Moreover, a review of the record on appeal shows that the testimony regarding Munoz' statements was not a significant part of R.R.'s testimony. R.R.'s testimony spanned 44 pages in the record. Munoz' statements about prison were discussed in two pages. Munoz' gang affiliation was never discussed. Moreover, other than R.R.'s testimony that Munoz told her he beat someone up and put them in the hospital, none of the testimony specifically identified Munoz' past crimes. Furthermore, it was not as though the State's only evidence of R.R.'s fear was her testimony regarding Munoz' statements. For example, R.R. further testified that Munoz told her, "You're a fighter, I like that, it makes me want you more." When R.R. told Munoz to leave her house, Munoz slapped her. Additionally, R.R. testified that when she tried to use the phone to call 911, Munoz took the phone away from her. Thus, even without the evidence of Munoz'

9

statements regarding his past crimes, the State would have likely been able to prove R.R.'s fear.

For those reasons, we hold that we are firmly convinced that the jury would not have reached a different verdict had a limiting instruction been given. As a result, Munoz has failed to show that the trial court's failure to give a limiting instruction was clearly erroneous.

Finally, we are perplexed by the trial court neglecting to give a limiting instruction in this matter. Because of the trial court's failure to give a limiting instruction, we were required to spend several more pages addressing whether the lack of a limiting instruction was clearly erroneous. Our Pattern Instructions for Kansas (PIK) explain that a limiting instruction is required under K.S.A. 2016 Supp. 60-455(b). Moreover, our Supreme Court has "strongly recommend[ed] the use of PIK instructions, which knowledgeable committees [have] develop[ed] to bring accuracy, clarity, and uniformity to [jury] instructions." *State v. Barber*, 302 Kan. 367, 377-78, 353 P.3d 1108 (2015).

*Did the Trial Court Err in Overruling Munoz'* Batson *Challenge?*

Next, "Munoz argues that the State's use of . . . preemptory challenges to strike Hispanic jurors from his jury was a violation of the equal protection clause of the 14th Amendment to the United States Constitution under *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986)."

In *Batson*, the United States Supreme Court examined the interplay between jury selection and the Equal Protection Clause. The Court explained:

"[A] defendant has no right to a 'petit jury composed in whole or in part of persons of his own race. . . . [However,] [t]he Equal Protection Clause guarantees the defendant that the State will

10

not exclude members of his race from the jury venire on account of race, . . . or on the false assumption that members of his race as a group are not qualified to serve as jurors . . .

. . . .

" . . . [B]y denying a person participation in jury service on account of his race, the State also unconstitutionally discriminates against the excluded juror. . . .

". . . Selection procedures that purposefully exclude [minority] persons from juries undermine public confidence in the fairness of our system of justice. [Citations omitted.]" 476 U.S. at 85-87.

Appellate courts reviewing a *Batson* challenge engage in a three-step analysis. Each step of the analysis has its own standard of review.

"First, the party challenging the strike must make a prima facie showing that the other party exercised a peremptory challenge on the basis of race. Appellate courts utilize plenary or unlimited review over this step.

"Second, if a prima facie case is established, the burden shifts to the party exercising the strike to articulate a race-neutral reason for striking the prospective juror. This reason must be facially valid, but it does not need to be persuasive or plausible. The reason offered will be deemed race-neutral unless a discriminatory intent is inherent in the explanation. The opponent of the strike continues to bear the burden of persuasion.

"Third, the trial court must determine whether the objecting party has carried the burden of proving purposeful discrimination. This step hinges on credibility determinations. '[U]sually there is limited evidence on the issue, and the best evidence is often the demeanor of the party exercising the challenge. As such, it falls within the trial court's province to decide, and that decision is reviewed under an abuse of discretion standard.' [Citations omitted.]" *State v. Kettler*, 299 Kan. 448, 461-62, 325 P.3d 1075 (2014).

Under the third step, the court must assess "the plausibility of that reason in light of all evidence bearing on it." *Miller-El v. Dretke*, 545 U.S. 231, 252, 125 S. Ct. 2317, 162 L. Ed. 2d 196 (2005). Still, the final burden of persuasion rests with the party challenging the strike. *State v. Washington*, 275 Kan. 644, 653-54, 68 P.3d 134 (2003).

11

Under this step "the reviewing court gives great deference to the trial court's actions because the findings turn on the trial court's evaluation of the prosecutor's credibility." *State v. Trotter*, 280 Kan. 800, 812, 127 P.3d 972 (2006). A trial court abuses its discretion (1) when no reasonable person would adopt its view; (2) when its actions are based on an error of fact; or (3) when its actions are based on an error of law. *State v. Marshall*, 303 Kan. 438, 445, 362 P.3d 587 (2015).

*Prima Facie Case*

Our first question in reviewing Munoz' *Batson* challenge is whether he made a prima facie showing that the State exercised its preemptory challenges on the basis of race. In making this determination, we exercise unlimited review. *Kettler*, 299 Kan. at 461.

After Munoz and the State were given an opportunity to examine the potential jurors, the State made the following preemptory strikes:  (1) P.G.; (2) K.B.; (3) E.A.; (4) O.M.; (5) T.R.; (6) L.A.; (7) R.A.; (8) J.O.; (9) S.H.; (10) L.G.; (11) C.C.; and (12) R.B. Munoz objected to six of the State's eight strikes. The details of those strikes will be discussed below. After the jury was set, Munoz requested that the ethnicities of the jurors stricken by the State be polled. It was determined that the State used 8 of its 12 preemptory strikes on potential Hispanic jurors—(1) P.G.; (2) E.A.; (3) O.M.; (4) L.A.; (5) R.A.; (6) J.O.; (7) L.G.; and (8) C.C.

The fact that the State used 8 of its 12 preemptory strikes on Hispanic jurors implicates a pattern of discrimination. See *Trotter*, 280 Kan. at 813. ("Looking at the numbers alone suggests discrimination existed in this case."). Thus, Munoz has made a prima facie showing that the State exercised its preemptory strikes on the basis of race.

12

*Race-neutral Reasons for Strikes*

Under this step, we will accept the nonchallenging party's reasons for the strikes as race-neutral unless discriminatory intent is inherent in the offered reason. We will take each of the State's strikes and race-neutral reasons in turn.

First, Munoz objected to the State's strike of O.M. The trial court requested that the State provide a race-neutral reason for striking O.M. The State responded:

> "Judge, I apologize, from looking at her, I wasn't even sure she was Hispanic. I guess from her last name, she may be. . . .
>
> . . . .
>
> "My race neutral reason for [O.M.] is that she seemed generally disinterested in the proceedings, that she was young, that she has a connection with a student who is on the potential jury pool."

The trial court accepted the State's race-neutral reasons for striking O.M.

Second, Munoz objected to the State's strike of L.A. The trial court requested that the State provide a race-neutral reason for striking L.A. The State responded:

> "[S]he admitted to knowing the defendant's mother, both at her current job and possibly her former job. So, that's what the State believes. We believe there's a close connection, and while it may not be close enough to be for cause for removal, it should be allowed by preemptory, at least."

The trial court accepted the State's race-neutral reasons for striking L.A.

Third, Munoz objected to the State's strike of R.A. The State provided the following race-neutral reasons for the strike:

"[T]he race neutral reason in that situation is that he knew the specific people on the jury panel and again, he had past history of some criminal activity. Our office has prosecuted him in the past for a crime that he admitted to. I, also, have something else written down, Judge, but I can't make it out."

The trial court did not expressly accept the State's race-neutral reasons for striking R.A. Still, the court acknowledged that R.A. had answered in the affirmative when asked if he had been prosecuted by the State. The trial court moved on, impliedly accepting the State's race-neutral reasons for striking R.A.

Fourth, Munoz objected to the State's strike of J.O. The trial court requested that the State provide a race-neutral reason for striking J.O. The State responded:

"First of all, Judge, I'm not even sure that he's Hispanic. But second of all, if he is Hispanic, which was never inquired into and is not a part of the record, he has a relationship with other individuals on the panel, he's a student and there's a professor. That may be some sort of an indication towards impartiality, and the State would not like to deal with. And if given the choice, the State has chosen for a completely race neutral reason to strike [J.O.]."

The trial court once again did not expressly accept the State's race-neutral reason for striking J.O. Nonetheless, the court's decision to move forward indicates that it did accept the State's reason for striking J.O.

Fifth, Munoz objected to the State's strike of L.G. Munoz requested that the State provide a race-neutral reason for the strike. The State responded:

"Judge, her occupation was a nurse, and Judge, I do believe that as a nurse that will be testifying today, I would like people that have no preconceived notions about the nature of nursing or about the nature of that activity. Furthermore, I would note that she

14

was unresponsive to several questions that I asked, and so I believe those are race neutral reasons."

The trial court asked the State to clarify why it would be bad to have a nurse on the jury. The State responded: "Well, I don't want anybody with any preconceived notions over the science of nursing or what may be admitted into evidence, Judge." The trial court again impliedly accepted the State's race-neutral reasons by moving on with the strikes.

Finally, Munoz objected to the State's strike of C.C. Munoz asked the court for a race-neutral reason for the strike. The State responded:

> "Judge, she stated that she had a cousin, a friend of a cousin that was subject to sexual assault. While she did say that she did not believe that would make her impartial, it does give the cause to suspect that she may not know the depth of her own inability to be impartial, in this matter. I think it's [a] substantial reason for the strike."

The trial court accepted the State's race-neutral reasons for striking C.C.

The State's reasons for the strikes are facially race-neutral. They are also supported by the record on appeal. As none of the offered reasons were inherently discriminatory, the trial court did not err under the second step of the analysis.

*Showing of Purposeful Discrimination*

Under the third step, we review the trial court's determination of discrimination or nondiscrimination for an abuse of discretion. "[T]he defendant has the burden to create the record of relevant facts and to prove his or her case to the trial court." *State v. Campbell*, 268 Kan. 529, 535, 997 P.2d 726 (2000). The trial court is not required to examine the State's race-neutral reasons on its own volition. See *Trotter*, 280 Kan. at 818 ("[I]t is not the trial court's duty *sua sponte* to compare the characteristics of the final

jurors with the characteristics of the people who were stricken"); accord *State v. Pham*, 281 Kan. 1227, 1239, 136 P.3d 919 (2006). Thus, Munoz had the ultimate burden of proof throughout the course of his *Batson* challenge. See *Kettler*, 299 Kan. at 462.

On appeal, "Munoz argues that the district court erred in its carrying out the third and final step of the *Batson* analysis, which requires the district court to provide [him] the opportunity to establish that the State's explanation for striking the jurors was mere pretext." But Munoz acknowledges that the trial court provided him with the opportunity to respond to the State's race-neutral reasons. Thus, Munoz is not arguing that the trial court abused its discretion by failing to complete the third step of the *Batson* analysis. Instead, Munoz is arguing that the trial court erred when it failed to rule that "the technically race-neutral reasons"—made by the State to remove potential Hispanic jurors—were pretextual based on the State using 8 of its 12 peremptory strikes against potential Hispanic jurors.

We turn now to the arguments that Munoz made to the trial court concerning the State's strike of potential Hispanic jurors.

In response to the State's race-neutral reasons for striking O.M., Munoz argued that it was inappropriate to strike a potential juror based on age. He further argued that striking someone based on their connection to another potential juror would likely result in striking the entire pool of potential jurors. Still, that left the State's reason for striking O.M. as disinterested. A review of the record neither proves nor disproves that O.M. was disinterested. Such an assertion is difficult to glean from a record on appeal. Hence, the reason we place great deference on the trial court's findings. See *Trotter*, 280 Kan. at 812. Moreover, giving the trial court its due deference, we cannot say that it abused its discretion in accepting the State's race-neutral reasons for striking O.M.

After the State's strike of L.A., Munoz elected not to offer any argument as to why the State's reasons were pretext. This is most likely because L.A. was struck from the potential jury pool because she worked with Munoz' mother. Munoz also elected not to offer any further argument in regard to the State's strikes of R.A. and J.O. R.A. had been previously prosecuted by the State for illegally drag racing, and J.O. was the student of another potential juror who was a college professor.

After the State's strike of L.G., the trial court asked Munoz if he would like to make any further argument. Munoz responded: "Your Honor, we are striking just about every single Hispanic we can. I just reaffirm my objection." Again, Munoz' counsel failed to expand on why the State's reason for striking L.G. was pretext for racial discrimination. As we have established, the number of Hispanic potential jurors that were stricken by the State was enough to raise a suspicion of discrimination. Still, Munoz' burden required that he affirmatively show that the State's reasons were pretextual. By simply relying on the number of strikes the State used on Hispanic potential jurors, Munoz' trial counsel failed to make such a showing.

After the State's strike of C.C., the trial court acknowledged the fact that the State was using the majority of its strikes on Hispanic potential jurors. The court addressed the State:

"I'm sure you're keeping a list. Let's go through what you got. [P.G., R.A., O.M., L.A., R.A., J.O., L.G., and C.C.]. I mean at what point does it really start looking like that's what we're doing here, counsel? *I'm getting nervous about it*." (Emphasis added.)

The State responded to the trial court:

"Well Judge, first of all, I would say that there's 30 some odd people, over a third of those people have some sort of a last name which may imply Hispanic background. Some of them as the State indicated, we did not recognize they were Hispanic. [O.M.], I don't

17

believe that she appeared Hispanic. And moreover, no one was questioned as to their ethnicity, so there's no way from us to ascertain truthfully whether or not someone is a Hispanic. There are some Hispanics that do remain that the State has no expectation of striking."

Again, the trial court provided Munoz' trial counsel an opportunity to address the State's remarks. Munoz' counsel did not offer any further argument relating to the State's reasons for striking C.C. This court cannot review for an abuse of discretion what the trial court did not have the opportunity to consider.

Even after the trial court provided Munoz' trial counsel with the opportunity to respond to each of the State's individual strikes, the court gave Munoz' counsel one more chance. After the ethnicity of the stricken jurors was polled, the trial court expressly asked Munoz' counsel, "[A]re you comfortable with the state of your record?" Munoz' counsel replied, "Yes, Your Honor." At that point, Munoz still had the burden of proving that the State's race-neutral reasons were pretextual for racial discrimination. Thus, Munoz' counsel needed to offer specific arguments to demonstrate that pretext. Instead, Munoz' counsel seemed to be content with the fact the record reflected that the State used 8 of its 12 preemptory strikes on Hispanic potential jurors. While numbers alone may *suggest* discrimination exists, our Supreme Court has held that numbers alone do not *prove* discrimination exists. See *Trotter*, 280 Kan. at 813-14 (discussing *Miller-El*, 545 U.S. 231). Munoz' trial counsel needed to do more.

On appeal, Munoz argues that the State's proffered race-neutral reason for striking C.C. was pretext for racial discrimination because the State did not strike a similarly situated individual from the potential jury pool. Munoz specifically argues that "the State did not strike juror [R.L.], even though [R.L.] admitted her aunt, a family member, had been the victim of sexual assault." We remember that C.C. was stricken because her cousin's friend had been the victim of a sexual assault about 1 year before Munoz' trial.

18

Munoz goes on to argue that "certainly the impartiality would be greater if a potential juror had a family member affected, as opposed to the more distant friend of a cousin."

The Supreme Court of the United States has expressly held that if a prosecutor's proffered reason for striking a minority potential juror applies equally to a white potential juror who is allowed to serve, that is evidence tending to prove racial discrimination. *Miller-El*, 545 U.S. at 241; *Trotter*, 280 Kan. at 818. Thus, Munoz seems to have a valid argument that the State's proffered race-neutral reason for striking C.C. was pretext for racial discrimination. But the trial court was unable to consider this argument because Munoz' trial counsel did not make it. In *Campbell*, our Supreme Court handled a similar situation. There, the court held:

> "With regard to comparability of challenged and unchallenged jurors, there is no indication that the defense here informed the trial court at the time of the *Batson* objection that there were non-stricken jurors of other races with characteristics similar to those cited by the State as race-neutral reasons for the strikes. As such, comparability forms a poor basis for attacking the trial court's decision on appeal. It is not the trial court's duty *sua sponte* to compare the information elicited from the other panelists with the characteristics named as reasons for striking the panelists whose removal is being challenged; the defendant has the burden to create the record of relevant facts and to prove its case to the trial court. [Citations omitted.]" *Campbell*, 268 Kan. at 535.

Here, too, Munoz failed to designate the record or at least point out the potential problem with C.C. to the trial court. Munoz had the ultimate burden of proving that the State's proffered race-neutral reasons were, in fact, pretextual for racial discrimination. On appeal, Munoz attempts to shift that burden to the trial court. Munoz' attempt is not persuasive. Under *Batson*, the trial court had "the duty to determine if the defendant ha[d] established purposeful discrimination." 476 U.S. at 98. Even so, that duty did not require the trial court to independently examine each of the State's race-neutral reasons for pretext. As Munoz had the burden of proof, it was his duty to make a showing of pretext.

19

Munoz failed to meet that burden. Moreover, even though his argument on appeal as it relates to C.C. may have merit, we review the trial court's actions for an abuse of discretion. Because the trial court did not hear that argument, we cannot use it as the basis on appeal to hold that the trial court abused its discretion.

The trial court did not err in overruling Munoz' *Batson* challenge. Munoz failed to show that the State's proffered race-neutral reasons for striking the challenged jurors were pretextual for racial discrimination.

*Is Munoz' Sentence for His Conviction for Intimidation of a Witness an Illegal Sentence?*

Whether a sentence constitutes an illegal sentence is a question of law over which appellate courts have unlimited review. *State v. Lee*, 304 Kan. 416, 417, 372 P.3d 415 (2016). "An illegal sentence is one imposed by a court without jurisdiction; a sentence that does not conform to the statutory provision, either in character or term of the punishment authorized; or a sentence that is ambiguous with regard to time and manner in which it is to be served." *State v. Smith*, 299 Kan. 962, Syl. ¶ 7, 327 P.3d 441 (2014); see K.S.A. 22-3504(1).

Here, Munoz was charged with aggravated intimidation of a witness under K.S.A. 2011 Supp. 21-5909(b)(1). Munoz was convicted of intimidation of a witness, which was a class B person misdemeanor. See K.S.A. 2011 Supp. 21-5909(c)(1). But Munoz was sentenced for aggravated intimidation of a witness, which was a severity level 6 person felony. See K.S.A. 2011 Supp. 21-5909(c)(2).

On appeal, both Munoz and the State agree that his sentence was illegal. We also agree, holding that because Munoz was not convicted of aggravated intimidation of a witness, the trial court lacked jurisdiction to sentence him for that crime. Moreover,

20

Munoz' sentence did not conform to the applicable sentencing statutes. Thus, Munoz' sentence was illegal. He should have been sentenced for intimidation of a witness.

Munoz argues that his case should be remanded for resentencing. On the other hand, the State argues that we should vacate Munoz' conviction without resentencing. Nevertheless, the sentencing court is responsible for the illegal sentence. Accordingly, we vacate Munoz' sentence in part and remand to the sentencing court to correct his illegal sentence.

*Did the Trial Court Err in Sentencing Munoz to Lifetime Postrelease Supervision?*

Munoz argues that "a plain reading of the entirety of K.S.A. 22-3717 reveals that the district court should have imposed a 36-month period of postrelease supervision plus good time and program credits pursuant to K.S.A. 22-3717(d)(1)(D)." Thus, Munoz argues that because he was sentenced to a period of lifetime postrelease supervision under K.S.A. 22-3717(d)(1)(G), his sentence is illegal.

As we stated before, whether a sentence constitutes an illegal sentence is a question of law over which appellate courts have unlimited review. *Lee*, 304 Kan. at 417. "An illegal sentence is one imposed by a court without jurisdiction; a sentence that does not conform to the statutory provision, either in character or term of the punishment authorized; or a sentence that is ambiguous with regard to time and manner in which it is to be served." *Smith*, 299 Kan. 962, Syl. ¶ 7; see K.S.A. 22-3504(1).

When Munoz was sentenced, K.S.A. 2015 Supp. 22-3717(d)(1)(D) read:

"(d)(1) Persons sentenced for crimes, other than off-grid crimes, committed on or after July 1, 1993, or persons subject to subparagraph (G), will not be eligible for parole,

21

but will be released to a mandatory period of postrelease supervision upon completion of the prison portion of their sentence as follows:

. . . .

(D) Persons sentenced to a term of imprisonment that includes a sentence for a sexually violent crime as defined in K.S.A. 22-3717, and amendments thereto, a sexually motivated crime in which the offender has been ordered to register pursuant to subsection (d)(1)(D)(vii) of K.S.A. 22-3717, and amendments thereto, electronic solicitation, K.S.A. 21-3523, prior to its repeal, or K.S.A. 2015 Supp. 21-5509, and amendments thereto, or unlawful sexual relations, K.S.A. 21-3520, prior to its repeal, or K.S.A. 2015 Supp. 21-5512, and amendments thereto, shall serve the period of postrelease supervision as provided in subsections (d)(1)(A), (d)(1)(B) or (d)(1)(C) plus the amount of good time and program credit earned and retained pursuant to K.S.A. 21-4722, prior to its repeal, or K.S.A. 2015 Supp. 21-6821, and amendments thereto, on postrelease supervision."

K.S.A. 2015 Supp. 22-3717(d)(1)(G) read:

"(d)(1) Persons sentenced for crimes, other than off-grid crimes, committed on or after July 1, 1993, or persons subject to subparagraph (G), will not be eligible for parole, but will be released to a mandatory period of postrelease supervision upon completion of the prison portion of their sentence as follows:

. . . .

(G) Except as provided in subsection (u), persons convicted of a sexually violent crime committed on or after July 1, 2006, and who are released from prison, shall be released to a mandatory period of postrelease supervision for the duration of the person's natural life."

As part of Munoz' sentence, the trial court imposed a term of lifetime postrelease supervision under K.S.A. 22-3717(d)(1)(G). Munoz argues that the trial court erred. He argues that he should have been sentenced to a 36-month term of postrelease supervision under K.S.A. 22-3717(d)(1)(D). Munoz' argument is a familiar one as it centers on this court's holding from *State v. Herrmann*, 53 Kan. App. 2d 147, 384 P.3d 1019, *rev. denied* 306 Kan. ___ (July 25, 2017).

22

In *Herrmann*, this court interpreted the statutory provisions relevant to Munoz' current appeal—K.S.A. 2015 Supp. 22-3717(d)(1)(D) and (d)(1)(G). The court held: "K.S.A. 2015 Supp. 22-3717(d)(1)(D) only applies to persons convicted of a sexually violent crime after July 1, 1993, but before July 1, 2006." 53 Kan. App. 2d 147, Syl. ¶ 5. The court further held: "There are no persons convicted of a sexually violent crime to whom both subparagraph K.S.A. 2015 Supp. 22-3717(d)(1)(D) and subparagraph K.S.A. 2015 Supp. 22-3717(d)(1)(G) apply." 53 Kan. App. 2d 147, Syl. ¶ 6. Thus, the *Herrmann* court held that any persons convicted of a sexually violent crime committed after July 1, 2006, will be sentenced to a mandatory period of lifetime postrelease supervision under K.S.A. 2015 Supp. 22-3717(d)(1)(G). The *Herrmann* court elaborated on its reasoning:

"We find the plain language of the statute clearly decides the issue presented. Subsection (d)(1) explains that persons sentenced for crimes committed after July 1, 1993, will not be eligible for parole; instead, they will be subject to mandatory postrelease supervision as provided in the subparagraphs that follow. Notably, however, this subsection (d)(1) expressly states that the mandatory postrelease supervision provided in the subparagraphs that follow do not apply to 'persons subject to subparagraph (G).' Subparagraph (G) provides that 'persons convicted of a sexually violent crime committed on or after July 1, 2006, and who are released from prison, shall be released to a mandatory period of postrelease supervision for the duration of the person's natural life.' Herrmann was convicted of attempted aggravated indecent liberties with a child, which is a sexually violent crime under subsection (d)(5)(C) and (d)(5)(M). His conviction occurred after July 1, 2006. Because Herrmann is subject to subparagraph (G), no other subparagraph following subsection (d)(1) applies to him—including subparagraph (D).

"... [T]he provisions in each subparagraph apply to a distinct class of persons. K.S.A. 22-3717 as a whole applies to all persons convicted of a crime after July 1, 1993. See L. 1992, ch. 239, sec. 270 ('Persons sentenced for crimes committed on or after July 1, 1993, will not be eligible for parole, but will be released to a mandatory period of postrelease supervision upon completion of the prison portion of their sentence.'). Subparagraph (G) was added to the statute in 2006 to create an explicit exception applicable only for 'persons convicted of a sexually violent crime committed on or after

23

July 1, 2006.' See L. 2006, ch. 212, sec. 19 (also adding language to [d][1] excepting 'persons subject to subparagraph [G]'). Reading subparagraph (D) in pari materia, it falls under subsection (d)(1) and so applies to all persons but those expressly excluded: persons sentenced for off-grid crimes committed on or after July 1, 1993, and persons committing a sexually violent crime on or after July 1, 2006, as stated in subparagraph (G). Therefore, subparagraph (D) only applies to persons convicted of a sexually violent crime after July 1, 1993, but before July 1, 2006. Thus, there are no persons convicted of a sexually violent crime to whom both subparagraph (D) and subparagraph (G) apply. Construing the statute as a whole and giving effect to all of the statutes, as this court must, there is no conflict or ambiguity in amended subsection (d)(1)." *Herrmann*, 53 Kan. App. 2d at 152-53.

On appeal, Munoz asks us to interpret K.S.A. 22-3717 without deference to the *Herrmann* panel. Munoz argues that the *Herrmann* panel erred in its decision because "there is nothing in K.S.A. 22-3717(d)(1)(D) limiting application of that subsection to only those offenders sentenced for sexually violent crimes between July 1, 1993 and July 1, 2006."

Munoz' argument ignores our legislature's recent amendments to K.S.A. 22-3717. The amendments show that the legislature intended to adopt the holding from *Herrmann*. In Senate Bill 112, our legislature cleared up any ambiguity between K.S.A. 22-3717(d)(1)(D) and (d)(1)(G) by amending K.S.A. 22-3717(d)(1)(D) to read:

"Persons sentenced to a term of imprisonment that includes a sentence for a sexually violent crime as defined in K.S.A. 22-3717, and amendments thereto, *committed on or after July 1, 1993, but prior to July 1, 2006*, a sexually motivated crime in which the offender has been ordered to register pursuant to K.S.A. 22-3717(d)(1)(D)(vii), and amendments thereto, electronic solicitation, K.S.A. 21-3523, prior to its repeal, or K.S.A. 2016 Supp. 21-5509, and amendments thereto, or unlawful sexual relations, K.S.A. 21-3520, prior to its repeal, or K.S.A. 2016 Supp. 21-5512, and amendments thereto, shall serve the period of postrelease supervision as provided earned and retained pursuant to

24

K.S.A. 21-4722, prior to its repeal, or K.S.A. 2016 Supp. 21-6821, and amendments thereto, on postrelease supervision." (Emphasis added.) L. 2017, ch. 62, § 10.

This court generally presumes that the legislature is knowledgeable about the subject matter of its statutes, including any prior and existing law and judicial decisions interpreting the same. *State v. Kershaw*, 302 Kan. 772, 782, 359 P.3d 52 (2015). Thus, we can presume that the legislature was aware of *Herrmann* when drafting its amendments to K.S.A. 22-3717. And based on that presumption, we can conversely presume that the *Herrmann* panel correctly interpreted K.S.A. 2015 Supp. 22-3717.

Here, Munoz was convicted of a sexually violent crime committed after July 1, 2006. Based on the holding from *Herrmann* and the legislature's amendments to K.S.A. 22-3717, we know that K.S.A. 2015 Supp. 22-3717(d)(1)(D) does not apply to Munoz. Thus, the trial court did not err in sentencing Munoz to a term of lifetime postrelease supervision under K.S.A. 2015 Supp. 22-3717(d)(1)(G). As a result, Munoz' argument fails.

Convictions affirmed, sentence for intimidation of a witness vacated, and this sentence remanded for resentencing.